(text box: 1) NO. 5-01-0027

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee, )  Marion County.

)

)  No. 99-CF-239

)

CHRISTOPHER FLETCHER, )  Honorable

)  Patrick J. Hitpas,

     Defendant-Appellant. )  Judge, presiding.

________________________________________________________________________

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a bench trial in the circuit court of Marion County, Christopher Fletcher (defendant) was found guilty of aggravated criminal sexual assault (720 ILCS 5/12-14(b)(i) (West 1998)) and sentenced to 12 years in the Department of Corrections.  Defendant raises the following issues on appeal: (1) whether defendant was denied his constitutional right to confront witnesses (U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8) and his constitutional right to counsel (U.S. Const., amend. VI) when the trial court allowed the child victim to testify via closed-circuit television without providing defendant a method of electronic communication with his attorney, (2) whether defendant was denied a fair trial when his statements, made without the benefit of 
Miranda
 warnings (
Miranda v. Arizona
, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)) to an investigator employed by the Department of Children and Family Services (Department), were admitted into evidence, (3) whether the trial court committed reversible error by allowing testimony relating to a polygraph test administered to defendant, and (4) whether the trial court violated defendant's due process rights by comparing defendant's signature with a document not admitted into evidence.  We affirm.    

I.  FACTS

On October 14, 1999, defendant was charged by information with one count of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 1998)).  On the day of the trial, the State filed an amended information.  The first count of the amended information charged defendant with aggravated criminal sexual assault.  The second count charged defendant with predatory criminal sexual assault of a child.  The charges stemmed from the victim's allegations that defendant fondled her and placed his finger in her vagina.  There were discrepancies about when the assault took place.  Information provided to the State indicated that the offense could have occurred as early as 1996 or as late as 1999.  Therefore, the first count alleged that the acts took place sometime between January 1996 and December 31, 1997.  The second count alleged that the acts took place between January 1998 and September 13, 1999.  The allegations in both counts were identical, with the exception of the dates.  The State alleged in both counts as follows, "[Defendant], a person 17 years of age or older, knowingly committed an act of sexual penetration upon [the victim], a person under 13 years of age, in that he placed his finger in the vagina of [the victim]."  

On May 11, 2000, the trial court conducted a pretrial hearing pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 1998)) to determine whether statements allegedly made by the victim to her mother and to a Department caseworker were admissible.  The trial court ruled that the statements were admissible.  On July 19, 2000, defendant waived his right to a jury trial.  A bench trial followed on September 29, 2000.  

The victim, age nine at the time of the trial, was the first witness to testify.  Prior to her testimony, the State told the trial court, "[P]ursuant to our rights to[,] we'd like to call [the victim] by closed-circuit television."  The trial court inquired whether a television was set up, and the prosecutor replied that he had taken the liberty of putting a television in the jury room.  The trial court directed defendant to go to the jury room, and the court asked defendant whether he had any trouble hearing.  Defendant replied that he was almost totally deaf.  The trial court then informed defendant once again how it was going to proceed, and the court told defendant that if for some reason he could not hear the victim's testimony, he should notify the bailiff immediately.  The State's Attorney volunteered one of his employees to perform a sound check.  Defense counsel noted that while he did not object to the sound check, he was preserving his objection for the closed-circuit television in general.  The trial court noted the objection but replied, "[T]he Supreme Court in Illinois says it's proper."  The State's Attorney began by asking the victim some preliminary questions, whereupon the State's Attorney's employee returned and reported that defendant could not hear.  Some minor adjustments were made to the equipment, and then the employee reported that defendant could hear.

The victim testified that she was in fourth grade and that her aunt used to be married to defendant.  She explained the difference between the truth and a lie.  She described a bad touch as "somebody touching you in your privates when you don't want them to."  She  said that defendant gave her bad touches.  She testified that this occurred at her cousin's (defendant's son's) birthday party.  Defendant asked her to accompany him to the store.  While they were in the car, defendant put his hand down her pants and touched the front of her and put his fingers inside of her.

The victim explained why she did not tell her parents immediately: "Because I was scared I would get hurt and so would my family."  The victim finally told her mother about the incident long after it occurred.  The victim was in the bathtub and started crying but did not know why.  According to the victim, this event happened at her cousin's third or fourth birthday party.  She testified that her cousin was six or seven at the time of the trial.  The victim was specifically asked whether this was the only time defendant touched her in this manner.  The victim replied, "I don't remember, so it's probably the only time."  After the victim was finished testifying, the trial court asked defendant whether he was able to hear the victim's testimony, and defendant assured the trial court that he had heard everything. 

The victim's mother (mother) testified that she and defendant's ex-wife are sisters.  She first learned about the abuse in the summer of 1999.  According to the mother, the victim was in the bathtub and started crying.  When she asked the victim what was wrong, the victim was reluctant to discuss the matter but ultimately admitted that defendant touched her private parts.  The victim told her that it happened at her cousin's birthday party.  The mother told the victim's father (father), and they decided they would try to handle the matter privately; however, two or three months later, the father reported the incident to the Department's hotline. 

The mother admitted that in the summer of 1999, defendant and his wife were going through a divorce, but she denied that this was the reason she reported the alleged abuse.  The mother explained that in September of 1999, the defendant's son, her nephew, was in her backyard playing with a neighbor's child.  The neighbor came rushing over to her house and told her that her nephew had "his pants down and was trying to perform sexual acts on the little neighbor boy."  The mother went outside and grabbed her nephew and asked him who had taught him to do that, and he replied that his father (defendant) had taught him.  The mother then told the father that they needed to tell her sister and the Department about the victim's abuse. 

Dennis Smith, the polygraph training coordinator at the Southern Illinois Crime Lab, testified that he met defendant on September 28, 1999.  Defense counsel then objected to any testimony relating to a polygraph.  The trial court allowed the testimony for the limited purpose of showing that defendant changed his original statement.  

According to Smith, he verbally admonished defendant that the procedure was voluntary and that defendant could end the questioning at any time.  Smith also said that defendant signed a waiver, but the record does not contain a waiver.  Smith testified that when he first questioned defendant, defendant was aware of the general allegations made by the victim.  Defendant initially denied that he ever touched the victim inappropriately; however, during a second interview, defendant admitted that he touched the victim's private parts.  According to defendant, the incident occurred in a bedroom.  He was talking with the victim and asked her if it would be okay if he touched her.  According to defendant, the victim said that it would be okay if he touched her, so he pulled down her underpants and proceeded to rub her vagina for a few seconds.  He said that he did not insert his finger, but he admitted that the tip of his finger may have entered the victim's vagina.  Mr. Smith then left the room and notified the Department investigator, Mimi Rapp, about defendant's admission.

Mimi Rapp testified that she was assigned by the Department to investigate the allegations of sexual abuse by defendant against the victim.  She interviewed the victim, who told her that defendant touched her a "few times," including at defendant's house, in his car, at the victim's house, and at the park.  The victim told her about an incident that occurred at her cousin's birthday party.  The victim told Ms. Rapp that she was in defendant's car when he reached down in her pants and touched her.  Defendant told her not to tell anyone.  The victim explained how she felt after it happened: "I was so sad that when I got out of the car, I dropped some sodas and got yelled at."  Ms. Rapp testified that she continued to question the victim about other alleged incidents.  At one point, the victim began to cry, and she said: "He said, 'It doesn't hurt,' but it did.  He said, 'No, it doesn't hurt.  Just let me do this a little bit more.' "  The victim also told her: "His finger went in me.  It hurt."  

After interviewing the victim, Ms. Rapp interviewed defendant.  She met him at his residence and informed him of the victim's allegations.  Defendant denied touching or fondling the victim or any other child.  Rapp asked defendant to take a polygraph examination, and he agreed to do so.  Rapp drove defendant to the crime lab in Carbondale, where a polygraph was administered.  The polygraph examiner called Ms. Rapp into the room and said that defendant needed to talk to her.  Defendant admitted that he touched the victim's privates and that his finger might have gone in her vagina, but only up to his fingernail.  Rapp took the victim back to an office in Salem and wrote out a statement reflecting defendant's earlier admission.  Defendant signed the statement.  The next morning, Rapp realized that she had made an error in the statement about how the victim came to be sitting on the bed where the abuse occurred.  Rapp called defendant at his house and told him that the statement needed to be clarified.  She then drove to his residence, where she rewrote the statement.  She went over the new statement with defendant.  Defendant signed the statement.  Both statements were introduced into evidence.  Rapp testified that she did not remember telling defendant that he did not need to call his lawyer.

After the State rested, defendant called Donna Mattmiller, a friend of defendant.  She  rode with defendant and Mimi Rapp to the crime lab in Carbondale in order to give defendant "moral support."  Mattmiller testified that during the ride to the crime lab, defendant asked Rapp whether he should have called his lawyer before he left home.  According to Mattmiller, Rapp told him that it was not necessary for him to call his lawyer.  Mattmiller further testified that she had left her grandchildren alone with defendant both before and after the charges were filed against him.  Mattmiller admitted that she was unaware that defendant had signed two statements admitting that he had molested his niece.   Defendant, age 33 at the time of the trial, testified that his marriage first started to break down in August 1998 but that he did not move out of the marital home until January 1999, because he could not find a place to live.  According to defendant, his divorce was still pending at the time of the trial.  Defendant testified that he graduated from high school and went to technical college.  Defendant testified that in addition to being nearly deaf, he is dyslexic and "can't read very well at all."  Defendant stated that he cannot read cursive writing at all.  The two statements written by Rapp and allegedly signed by defendant were written in cursive.

Defendant denied ever inserting his finger into the victim's vagina or ever touching her in an inappropriate manner.  He testified that he has never been alone with the victim in a vehicle and that the incident at the birthday party never occurred.  The first time he became aware of the victim's allegations was during his initial conversation with Mimi Rapp.  

Defendant further testified that Dennis Smith told him that he could not leave until he made a statement to Rapp.  Defendant told Smith that the victim had fallen and that he checked to see if she was okay.  He ended up putting medicine on her while her sister was in the room and even told her mother about the incident.  Smith then called Mimi Rapp into the room.  Defendant testified, "[Smith refused to let me] speak any time that I was trying to tell Mimi Rapp all this."  Defendant said he was unaware what was put in the statement until he was in court and the statements were read to him.  Defendant denied that it was his signature on the statements.  He agreed that Rapp read statements to him, but he asserted that the statements read in court were not the statements she read to him.  Defendant stated, "[The statements Rapp read to me] did not state anything about me inserting my finger into a child or anything whatsoever."  Defendant alleged that the signature on his driver's license would prove that the signatures on the statements are not his.  Defendant then introduced his driver's license into evidence.  The license was issued on October 5, 1999. 

The State called defendant's ex-wife in rebuttal.  She testified that she and defendant were married for approximately seven years but that their divorce was final.  She also testified that she saw defendant read cursive writing on numerous occasions during the course of their marriage, including notes she left for him.  She noted that defendant always followed the directions she left in the notes written in cursive.  She was aware that as a child he was dyslexic and that he has difficulty hearing.  She said that over the course of their marriage, she had seen his signature on numerous occasions.  She went on to identify the signatures on the two statements as defendant's signatures.           

After hearing all the evidence, the trial court noted that it found the victim "quite credible."  The trial court also pointed out that Dennis Smith and Mimi Rapp had no reason to lie.  Furthermore, the trial court did not believe that the delay in reporting made the allegations less credible.  Instead, the trial court noted that if the allegations were false, they would have been brought up sooner rather than later.  The trial judge described his overall opinion of defendant's testimony: "[A]bout as incredible as any testimony I have heard in a long time."  The trial court found defendant guilty of count I.  As to count II, the trial court was unsure whether predatory criminal sexual assault was a proper charge, and thus it declined to enter a judgment on count II.  Defendant was sentenced to 12 years in the Department of Corrections.  Defendant now appeals.

II.  ANALYSIS

A.  Closed-Circuit Television

Defendant contends that allowing the victim to testify via closed-circuit television, without providing defendant and his attorney a method of electronic communication, violated defendant's constitutional rights to confrontation and counsel.  First, defendant asserts that there was no finding pursuant to section 106B-5 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/106B-5 (West 1998)) that the victim would suffer serious emotional distress if required to testify in the presence of defendant.  Defendant argues that therefore the trial court erred in allowing the victim to testify via closed-circuit television.  Second, defendant asserts that the use of closed-circuit television separated defendant from his attorney during the most critical testimony of the trial.  Defendant insists that he was prejudiced and that he is entitled to a new trial.  The State replies that any error that occurred as a result of the trial court allowing the victim to testify via closed-circuit television was harmless.  We agree with the State.

Section 106B-5 of the Code provides in pertinent part as follows:

"(a) In a proceeding in the prosecution of an offense of criminal sexual assault, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual abuse, or aggravated criminal sexual abuse, a court may order that the testimony of a child victim under the age of 18 years be taken outside the courtroom and shown in the courtroom by means of a closed circuit television if:

***

(2) the judge determines that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate or that the child will suffer severe emotional distress that is likely to cause the child to suffer severe adverse effects.  

* * *

(f) The defendant shall be allowed to communicate with the persons in the room where the child is testifying by any appropriate electronic method."  725 ILCS 5/106B-5(a)(2), (f) (West 1998).

The procedures set forth in the statute have been found to meet constitutional demands.  
People v. Van Brocklin
, 293 Ill. App. 3d 156, 687 N.E.2d 1119 (1997).  The statute requires that before a victim is allowed to testify via closed-circuit television, the trial court must make a finding that "testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate or that the child will suffer severe emotional distress that is likely to cause the child to suffer severe adverse effects."  725 ILCS 5/106B-5(a)(2) (West 1998).  The State's interest in the physical and psychological well-being of a child abuse victim is sufficiently important to outweigh, "at least in some cases," a defendant's right to face his accuser in court.  
Maryland v. Craig,
 497 U.S. 836, 852-53, 111 L. Ed. 2d 666, 682-83, 110 S. Ct. 3157, 3167 (1990).  The Supreme Court in 
Craig
 considered the constitutionality of a Maryland statute and determined that the requisite finding of necessity must be case-specific, meaning that the trial court must hear evidence and determine whether the use of the one-way closed-circuit television procedure is necessary to protect the welfare of the particular child victim who seeks to testify.  
Craig
, 497 U.S. at 855-56, 111 L. Ed. 2d at 685, 110 S. Ct. at 3169.  However, our statute does not require a hearing to determine whether the best interests of the child would be served by allowing the child to testify via closed-circuit television.  We agree with our colleagues in the Fourth District that "[h]ad the legislature intended to require a hearing, it would have so provided."  
People v. Schmitt
, 204 Ill. App. 3d 820, 825, 562 N.E.2d 377, 382 (1990).  Because our General Assembly did not impose a hearing requirement, we will not impose one.  See 
Schmitt
, 204 Ill. App. 3d at 825, 562 N.E.2d at 382.

The State points out that the discussions concerning the use of closed-circuit television took place off the record, because when the issue was raised at the trial before the victim testified, defense counsel stated: "I'm preserving my objection for the record on the closed circuit TV testimony.  I believe I previously objected."  The trial court replied that defense counsel had indeed previously objected; nevertheless, the trial court believed that the use of the closed-circuit television was proper in this case.  The trial court never invoked the statutory language that the victim would suffer serious emotional distress such that she could not reasonably communicate or that the victim would suffer severe emotional distress likely to cause the victim to suffer severe adverse effects.

While the record before us is weak in terms of presenting a case-specific basis for allowing the victim to testify by means of closed-circuit television, it can be presumed that forcing the victim, age nine, to testify in front of defendant, who was her uncle, would cause the victim trauma and emotional distress.  What we find most problematic in the instant case is the fact that the trial court failed to fully follow the procedures outlined in the statute–defendant was not provided a means of electronic communication with the persons in the room where the victim was testifying, as required by the statute.  As a result, defendant was denied access to counsel during the victim's testimony.  Under these circumstances, the admission of the victim's testimony was in conflict with defendant's sixth amendment right to counsel.  However, such a violation does not automatically entitle defendant to a new trial.   A defendant's conviction can be affirmed even if errors of a constitutional magnitude have occurred, but only if the errors are harmless beyond a reasonable doubt.  
People v. Lofton
, 194 Ill. 2d 40, 61, 740 N.E.2d 782, 794-95 (2000).  For the harmless error doctrine to apply, a reviewing court must find, beyond a reasonable doubt, that the errors did not contribute to the defendant's convictions.  
People v. St. Pierre
, 122 Ill. 2d 95, 113-14, 522 N.E.2d 61, 68 (1988).  Errors may be harmless if (1) they did not contribute to the defendant's conviction, (2) overwhelming evidence supports the defendant's conviction, and (3) the evidence was cumulative or corroborative of other evidence properly presented.  
People v. Averhart
, 311 Ill. App. 3d 492, 507, 724 N.E.2d 154, 166 (1999). 

Defendant asserts that the trial court placed much emphasis on the victim's testimony and even noted that it found the victim quite credible.  What defendant fails to consider, however, is that the State was armed with not one but two confessions made by defendant.  While defendant denied making these statements, the trial court found defendant's testimony completely incredible.  The trial court pointed out that neither Dennis Smith, the polygraph examiner, nor Mimi Rapp, the Department investigator, had any reason to lie about defendant's confessions.  Both of these witnesses testified that defendant not only admitted  touching the victim's genital area but also admitted that his finger might have penetrated the victim's vagina.  The victim's mother testified that she first learned of the alleged sexual contact when the victim was in the bathtub and started crying.  The mother asked the victim what was wrong, and the victim told her that her uncle "touched her in places she didn't want to be touched."  The victim explained to her mother that her uncle touched her "bottom private parts."  Accordingly, the victim's testimony was cumulative because both the victim's mother and Mimi Rapp testified concerning what the victim told them about the alleged incident.  The State presented ample evidence of defendant's guilt beyond the testimony of the victim, and therefore, the error was harmless beyond a reasonable doubt.

B.  Admissibility of Defendant's Statements

Defendant next argues he was denied a fair trial when the statements he made to a Department caseworker without the benefit of 
Miranda 
warnings were admitted into evidence.  See 
Miranda v. Arizona
, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).  Defendant insists that these statements should have been suppressed.  However, as the State points out, defendant failed to file a motion to suppress, thereby waiving the issue on appeal.  Even assuming, 
arguendo
, that the issue was not waived, the situation here indicates that the statements in question did not require defendant to first be apprised of his 
Miranda
 rights, because defendant was not in custody at the time either of the statements was made.

An interrogation is custodial if a person has been taken into custody or his freedom is restricted in any significant way.  
People v. Brown
, 136 Ill. 2d 116, 124, 554 N.E.2d 216, 219 (1990).  If a defendant is not in custody or subject to custodial interrogation, 
Miranda
 is inapplicable.  
People v. Lucas
, 132 Ill. 2d 399, 548 N.E.2d 1003 (1989).  Whether an interrogation is custodial is decided upon the totality of the circumstances and upon what a reasonable person would perceive the situation to be.  
People v. Foster
, 195 Ill. App. 3d 926, 943, 552 N.E.2d 1112, 1125 (1990).  In determining whether a statement was made in a custodial setting, the court must look to all of the circumstances surrounding the questioning and then objectively determine whether a reasonable person, innocent of any crime, would have believed he was free to leave or expressly or impliedly bound to remain.  
People v. Savory
, 105 Ill. App. 3d 1023, 1028, 435 N.E.2d 226, 230 (1982).  Circumstances to be considered include the location, time, length, mood, and mode of the interrogation, the number of police officers present, the presence or absence of the family and friends of the accused, any indicia of formal arrest, and the age, intelligence, and mental makeup of the accused.  
Savory
, 105 Ill. App. 3d at 1028, 435 N.E.2d at 230.   

In the instant case, no police officers were present when defendant made the statements in question.  Mimi Rapp notified defendant of the victim's allegations.  Defendant voluntarily agreed to a polygraph examination and went with Rapp to the crime lab in Carbondale.  Defendant was accompanied by his friend, Donna Mattmiller, who came along for "moral support."  The fact that defendant asked if he needed an attorney does not mean defendant believed he was in custody.  Defendant was not under arrest at the time.

Moreover, there is not even any indication that defendant's freedom was restricted.  Even though defendant testified that the polygraph examiner told him he could not leave until he made a statement, the polygraph examiner, Dennis Smith, denied making such a statement.  The trial court found Smith to be a much more credible witness than defendant.  After defendant made an admission, he returned with Rapp to the Salem office, where he signed the first statement.  Even after signing the statement, he was not arrested but was permitted to go home.  The next morning, Rapp realized she had made a mistake in writing down how the victim came to be sitting on the bed.  She called defendant at his house and told him the statement needed to be clarified.  Rapp then drove to defendant's residence, where defendant signed a second statement.  Defendant was not charged with any offense until a few weeks after he signed the statements.  Under these circumstances, 
Miranda 
warnings were not necessary because defendant was clearly not in custody when either statement was made.

C.  Polygraph Evidence

Defendant also contends that the trial court committed reversible error by allowing testimony relating to the polygraph test administered to defendant.  Defendant insists that the probative value of the evidence was minimal but the prejudicial effect was great and that, thus, the trial court abused its discretion by admitting testimony relating to the polygraph.  We disagree.

There is a firmly established rule in Illinois against the introduction of the details of the results of polygraph examinations.  
People v. Lewis
, 269 Ill. App. 3d 523, 527, 646 N.E.2d 305, 308 (1995).  The rationale for the rule is that polygraph evidence does not have sufficient reliability for admission, and as the Illinois Supreme Court has observed, if admitted, it is likely to be taken not merely as reliable but as completely determinative of guilt or innocence.  
People v. Gard
, 158 Ill. 2d 191, 201, 632 N.E.2d 1026, 1031 (1994).  However, polygraph evidence is admissible if it is used to rebut a claim by the defendant that his incriminating statement was improperly obtained.  
People v. Jefferson
, 184 Ill. 2d 486, 496, 705 N.E.2d 56, 61 (1998).  

In the instant case, when the trial court allowed the State to present evidence that a polygraph had been taken, defendant had not yet testified; however, in his opening statement, defense counsel set forth that defendant denied signing the written confessions.  Defense counsel stated as follows:

"We submit he denies that he signed the written statement taken by Mimi Rapp.  He denies that he was able to read those statements and that different things were told to him before those statements were written.  He will be testifying and denying these allegations, Your Honor."

Defendant opened the door for the State to present evidence concerning the fact that a polygraph test had been administered.  The polygraph evidence became admissible because defendant chose to challenge the circumstances that caused him to make the statements.  See 
Jefferson
, 184 Ill. 2d at 497, 705 N.E.2d at 62.

It is undeniable that the evidence regarding the polygraph suggested that defendant's initial story, as well as his denial of guilt at the trial, was false and that defendant's signed statements were true.  However, the trial court was well aware that the polygraph evidence could be used only for a limited purpose.  The trial court stated: 

"I think it would be admissible on the limited purpose of if there was a change in a statement made.  If an exam was done, I don't want to know, and if, in fact, an exam was done, I don't want to know the results, because I agree that was not admissible.  But for the limited, very limited, purpose of explaining the status of what happened on a certain day at a certain time, I'll allow the testimony that at least there was a meeting regarding a polygraph."

A trial judge is presumed to consider admissible evidence only and to consider evidence introduced for a limited purpose for that purpose only.  
People v. Lewis
, 147 Ill. App. 3d 249, 258, 498 N.E.2d 1169, 1176 (1986).  Here, we have more than just a presumption.  We have a record in which the trial judge assured all concerned that he would not consider polygraph evidence in reaching a judgment.  The trial judge's statement convinces us that he was well aware of the inherent weaknesses of polygraph testing and that he did not consider the polygraph evidence in determining defendant's guilt.  Therefore, even assuming, 
arguendo,
 that the polygraph evidence was improperly admitted, we find the resulting error harmless.

D.  Comparison of Defendant's Signature

Defendant's final contention on appeal is that the trial court violated his due process rights by 
sua sponte
 comparing his signature on his alleged statements with the signature on his bail-bond form, which was not admitted into evidence.  The State replies that defendant waived this issue by failing to object at the trial and by failing to raise the issue in his posttrial motion.  The State contends that the issue can, therefore, only be reviewed under the plain error doctrine and that under this doctrine, it is clear defendant did not suffer prejudice requiring a reversal.  We agree with the State.

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."  134 Ill. 2d R. 615(a).  In order to invoke the  plain error doctrine, it must be plainly apparent that an error so prejudicial has occurred so that real justice has been denied or that the verdict may have resulted from error.  
People v. Tucker
, 317 Ill. App. 3d 233, 240-41, 738 N.E.2d 1023, 1029 (2000).

In the present case, we do not agree that a serious injustice would occur or that the judgment might have been different if the trial judge had not compared defendant's alleged signature on the statements with defendant's signature on his bail-bond card.  Defendant's ex-wife identified the signature on the statements as defendant's.  She testified that she and defendant were married for seven years, during which time she became well-acquainted with defendant's signature.  Furthermore, as we previously set forth, there was more than sufficient evidence on which defendant could be found guilty.  The trial court found that defendant lacked credibility for numerous reasons, not just because the signatures on the statements and the bail-bond card matched.

III.  CONCLUSION

We have reviewed the record before us and find that even though defendant did not receive a perfect trial, he did receive a fair trial.  Neither a single error nor the cumulative effect of errors warrants a new trial.  Defendant's conviction and sentence are affirmed.   

For the foregoing reasons, the judgment of the circuit court of Marion County is hereby affirmed.

Affirmed.

HOPKINS and CHAPMAN, Melissa, JJ., concur.

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 03/27/02.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.