NOTICE

Decision filed 10/15/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180384-U

NO. 5-18-0384

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Massac County. |
| | ) | |
| v. | ) | No. 17-CF-122 |
| | ) | |
| JORGE TUGNON, | ) | Honorable |
| | ) | Joseph M. Leberman, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's admission of testimonial evidence regarding text messages sent by the defendant was not an abuse of discretion, and even if admitted in error, would constitute harmless error, as the trial court did not consider the evidence in its guilty finding.

¶ 2    Following a bench trial, the defendant, Jorge Tugnon, was convicted of criminal sexual assault and subsequently was sentenced to a term of nine years in the Illinois Department of Corrections. On appeal, the defendant argues that he was denied a fair trial because of the introduction of text messages relating to other-crimes evidence that, the defendant argues, failed to comply with section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2016)) and lacked probative value. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4     The State charged Jorge Tugnon with two counts of criminal sexual assault by information filed on August 11, 2017. Count I alleged that the defendant, in violation of section 11-1.20(a)(1) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/11-1.20(a)(1) (West 2016)), knowingly committed an act of sexual penetration against E.L. The State alleged that while E.L. was sleeping, the defendant, by use of force, placed his penis in contact with the sex organ of E.L. In count II, the State charged the defendant with criminal sexual assault in violation of section 11-1.20(a)(2) of the Criminal Code (*id.* § 11-1.20(a)(2)), alleging that the defendant, while knowing that E.L. was unable to give knowing consent, committed an act of sexual penetration with E.L. in that the defendant placed his penis in contact with the sex organ of E.L. while she was sleeping. Both charges were Class 1 felonies.

¶ 5     On February 27, 2018, the defendant waived his right to have a trial by jury and elected to proceed to bench trial. On March 7, 2018, the State filed a notice of other-offense evidence that it intended to introduce at trial pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2016)). According to the notice, the defendant repeatedly attempted to sexually penetrate L.A, who he dated for seven years, while she was sleeping during the period of 2007 to 2014. A hearing was held on the notice on April 25, 2018, during which L.A. testified that she lived with the defendant from 2007 to 2012. The relationship was on-again, off-again starting in 2011, and from 2011 to 2012, there were 7 to 10 times that the defendant had sex with her while she was sleeping. L.A. testified that she had gotten very upset, and they fought when it happened. The defendant would apologize but then do it again. According to L.A., the defendant attended church and saw therapists to deal with the issue.

¶ 6    L.A. testified that she had communicated with the defendant via text messages around the time of the alleged incidents. The State offered a printout of texts between L.A. and the defendant as an exhibit at the hearing. The defendant objected to the admission of the exhibit based on a lack of foundation, arguing that the text messages could not be authenticated based on a lack of date, time, phone records, or other identifying information, but the court overruled the objection. L.A. testified that in the texts, the defendant said he knew that he had a problem and was addicted to pornography. In a written order filed April 30, 2018, the trial court found that the defendant's conduct of attempting to have sexual intercourse with L.A. as she was sleeping was admissible at trial under section 115-7.3 of the Code (*id.*). The trial court's order allowed the State to introduce evidence of other crimes "limited to evidence that [the defendant] attempted or performed vaginal intercourse with [L.A.] while she was asleep in their residence."

¶ 7    At the defendant's bench trial, held on April 30, 2018, E.L. testified that she lived in Metropolis, Illinois, with her mother, Lori Honey. The defendant was Honey's boyfriend and also lived at the house. On July 26, 2017, E.L. and her boyfriend, Blake Lynch, went to bed around seven or eight o'clock in E.L.'s bedroom, which was in the basement of the house. E.L. was wearing pajama shorts, underwear, and a t-shirt when she went to sleep. Later that night, E.L. was woken up with her pants and underwear pulled down while the defendant was on top of her from behind with his penis in her vagina. E.L. turned over and the defendant, who was only wearing shorts, ran out of the room. E.L. testified that she did not think he ejaculated or used a condom. E.L. further testified that prior to this encounter she had consensual sex with Lynch that day.

¶ 8    E.L. tried waking Lynch, but he would not wake up, so E.L. went upstairs to Honey's bedroom, where she was asleep. E.L. turned on the light and told Honey what had happened.

3

Honey called the police. E.L. saw the police talking to the defendant outside as the police escorted E.L. to a police car to take her to the hospital for a sexual assault examination. E.L. testified that prior to this incident, the defendant had acted inappropriately toward her. He passed by her extra close in the house and commented on her clothes. According to E.L., one time he walked completely naked out of the shower. The defendant also told E.L. that she was sexy. E.L. also testified that right before this incident, she caught the defendant going through her underwear drawer.

¶ 9 Honey testified that she started dating the defendant in January of 2015, and that he moved in approximately one year later. According to Honey, on July 26, 2017, E.L. went to bed before the defendant because he said he was not tired and was going to go outside to watch pornography. Honey testified that about one hour later, E.L. came into Honey's room, flipped on the light, and said that she had woken up with the defendant inside of her.

¶ 10 Honey went to the back patio where the defendant normally smoked, but he was not there. Honey went back inside and called 911. She went outside so she could tell the police the defendant's license plate number and saw the defendant, who asked whether she was calling the cops on him. Honey did not respond, and the defendant said he did not do it. Honey went back inside and refused to let him in. The police soon arrived and took E.L. to the hospital and brought the defendant to the police station.

¶ 11 Honey testified that about a week before this incident, she had asked the defendant to look for marijuana that E.L. kept in a small box in her bedroom. Honey also testified that she learned that the defendant had said to E.L. that he thought she was sexy and had asked Lynch if E.L. was good in bed. Honey said that her relationship with the defendant was coming to an end before this incident and she had tried to break up with him.

4

¶ 12    Lynch testified that several months before this incident, the defendant asked him if E.L. was good in bed. Lynch responded by asking if Honey was good in bed. Lynch told E.L. about the comments. On July 26, 2017, he went to bed with E.L. around eight o'clock. He was awoken that night with E.L. saying that the defendant was "trying to mess with her or something like that" and that the cops were there. He had not seen anyone else in the room.

¶ 13    Officer Don Helm testified that he responded to the house on July 26, 2017, after receiving a call about a possible sexual assault. He spoke with Honey who said that E.L. may have been sexually assaulted. E.L. explained what happened and said she wanted to file charges, then agreed to go to the hospital and have a sexual assault kit done.

¶ 14    Robin Newcomb, a nurse at Massac Memorial Hospital, testified that she took part in the sexual assault exam and provided the sexual assault evidence collection kit to the Metropolis police. The parties stipulated to the admission of a lab report which indicated that the defendant could be excluded as contributing to DNA found on samples taken from E.L. Lynch could not be excluded.

¶ 15    L.A. testified at trial pursuant to the trial court's pretrial ruling allowing the State to present evidence of other crimes regarding her allegations that the defendant had engaged in nonconsensual sexual activity while she was sleeping. During the State's direct examination of L.A., the prosecutor presented L.A. with a printout of multiple pages of text messages purported to be between her and the defendant. The defendant objected to the admission of the evidence of the text messages, arguing that the text messages could not be authenticated, as they were not dated and there were no phone numbers. The trial court overruled the objection. L.A. then read a text where the defendant stated he had been watching and enjoying videos of drunk and sleeping

5

girls being taken advantage of. L.A. admitted that she stated in a text that she would be "willing to do those things with you as long as I am not hurt as role play."

¶ 16    The defendant testified in his defense. The defendant testified that he met Honey when they worked together at a plant in Paducah, Kentucky. Honey was a human resources employee, and the defendant was a crane operator. L.A. also worked at the plant, and the defendant explained that he began dating Honey after talking with Honey about allegations L.A. made against him. By 2016, the defendant began staying regularly at Honey's house. The defendant started living at Honey's house for about six months before E.L. moved in along with her daughter, Honey's granddaughter. According to the defendant, Honey was concerned that E.L. had drugs in the house while her granddaughter was there. Honey asked the defendant to search E.L.'s living area for drugs, and the defendant testified that he found marijuana, pills, and a piece of mirror with white powder. The defendant told Honey about what he found and started searching more when Honey said she wanted to get custody of the granddaughter.

¶ 17    The defendant testified that E.L. caught him searching her room a couple of times, including once when the defendant was searching her underwear drawer for drugs. The defendant admitted that he once asked Lynch if E.L. was good in bed but claimed he did so because he had heard that E.L. was doing sexual favors for drugs and the defendant claimed that he was trying to figure out more about her relationship with Lynch. The defendant also admitted telling E.L. he thought she was sexy, but he claimed that was also to find out if she was having sex with Lynch to get drugs.

¶ 18    The defendant testified that on July 26, 2017, he told Honey he was going outside to smoke, not to watch pornography, and when he came back inside, he went down to E.L.'s room to ask her to turn the television down because it was too loud. The defendant testified that he was

not wearing a shirt, shoes, or socks, but was wearing shorts. He testified that he nudged E.L. on her shoulder and she did not wake up. He then decided to search E.L.'s room for drugs, because it was more likely the drugs would be there when she was there. As he was searching, E.L. moved a little, so he left the room but then returned and searched her underwear drawer and was leaving the room when E.L. woke up.

¶ 19    The defendant testified that he voluntarily went to the Metropolis Police Department and gave a statement. After a few weeks, he went to Texas because he had family in El Paso, and he was later arrested there. The defendant denied ever having sex with L.A. when she was sleeping. He testified that she held a grudge against him because he kept a good relationship with his son's mother. The defendant further testified that his and L.A.'s fights would get physical, and she once pulled a gun on him.

¶ 20    Chantelle Reed testified that she had known the defendant for at least 17 years, and they have a child together. It was her opinion that the defendant, who was a Zumba instructor, had a reputation in the community for being respectful to women.

¶ 21    The trial court found the defendant not guilty as to the first count of criminal sexual assault using force, and guilty as to the second count of criminal sexual assault as the victim was unable to give consent. On May 31, 2018, the defendant filed a motion for a new trial. In that motion the defendant argued, among other claims of error, that the trial court permitted the State to read from text messages without an adequate foundation being laid. The trial court denied the motion for a new trial and sentenced the defendant to nine years in the Illinois Department of Corrections with three years to natural life supervised mandatory release. On July 23, 2018, the defendant filed a notice of appeal.

¶ 22                                    II. ANALYSIS

¶ 23     The defendant argues on appeal that the trial court's admission and consideration of text messages unrelated to the other-crimes evidence denied him a fair trial, as it violated the trial court's pretrial order limiting the other-crimes evidence admitted pursuant to section 115-7.3 of the Code. The trial court's pretrial order allowed the State to introduce evidence of other crimes "limited to evidence that [the defendant] attempted or performed vaginal intercourse with [L.A.] while she was asleep in their residence." Next, the defendant argues that the trial court's admission and consideration of the defendant's text messages denied him of a fair trial, as the text messages were introduced for the purpose of portraying the defendant as a man of bad character and were more prejudicial than probative.

¶ 24     In response, the State argues that the text messages that the defendant complains of were never admitted into evidence, and thus, no error occurred. According to the State, since the trial court explicitly made a ruling that it was only going to consider the testimony about text messages for purposes of their relevancy to other-crimes evidence and the defendant's sexual conduct toward L.A., the trial court limited its consideration of the testimonial evidence.

¶ 25     A trial court's evidentiary determination will not be overturned absent an abuse of discretion. *People v. Blom*, 2019 IL App (5th) 180260, ¶ 35. An abuse of discretion will only be found where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable man would take the view adopted by the trial court. *Id.*

¶ 26     Based on the record in this matter, we must agree with the State that the trial court did not admit or consider the text messages during the defendant's bench trial. During the course of the trial, while questioning L.A., the State referred to the printout of text messages as State's exhibit number four. Defense counsel objected to the introduction of the text messages based on

foundation. The State argued: "This is actually just a recording of her as if she were conversing with the Defendant and she is recalling that conversation she had, although it occurred via text rather than over the phone or in person." The trial court overruled the objection, as the State had not yet moved to admit any evidence but stated affirmatively that it would not admit evidence that does not have a proper foundation. The trial court allowed the State to proceed in its attempt to lay a proper foundation for the admission of the exhibit.

¶ 27    While the State was attempting to lay the foundation for the text messages, the defendant objected to their admission based on the fact that they were outside of the scope of the pretrial ruling on other-crimes evidence. The subject matter of the text messages the State was seeking to introduce involved the defendant's admission that he watched videos of men taking advantage of women sleeping. The State responded that the witness had testified that she was penetrated on several occasions by the defendant while she was sleeping. The State explained it was offering the text messages to lend credibility to the witness's testimony, and to show motive as to the witness and the victim's sexual assaults. The State was allowed to lay further foundation, after which the State requested the witness be allowed to read a text from exhibit four aloud for the court.

¶ 28    The trial court held: "I'm going to overrule the objection as long as the text is in the time frame that you've talked about, and it has to do with the Court's ruling regarding other crimes evidence." The trial court further stated: "I think anybody can testify from their personal knowledge, and if we didn't have text messages, she could still testify about what she recalls. And if something helps refresh her recollection, she could testify." The State then asked the witness in the message that began "I been watching," what did he say he had been watching? The witness answered "videos." The State asked: "And is there anything that's described that relates

to the Court's Order as your [*sic*] testimony?" The witness answered, " 'Advantage'—'taking advantage of drunk girls, girls sleeping, girls being humiliated, choked with cocks'—'and that turns me [the defendant] on.' "

¶ 29    At this point the defendant again objected based on the testimony being outside the pretrial ruling allowing other-crimes evidence. That objection was overruled. The State asked about the next message, which the witness read as stating, " 'I know it sounds bad and creepy and sickening.' " The defendant again objected, and that objection was overruled. The State did not offer to admit the printout of text messages, exhibit four, into evidence, and it was not admitted.

¶ 30    The defendant filed a motion for a new trial on May 31, 2018. In that motion the defendant argued that the trial court permitted the witness to read from text messages before ruling that a foundation for the text messages could not be made, and that the introduction of the text messages was in violation of section 115-7.3 of the Code. During the June 25, 2018, hearing on that motion, the defendant stated:

> "I don't believe the text messages should have ever been—ever been in the Court's hands because no foundation could be laid for them and they could not be authenticated, which I kept arguing at the pretrial—at the pretrial hearing."

There is nothing in the record that indicates that the State's exhibit 4 was admitted into evidence.

¶ 31    Regarding the text messages, the following colloquy occurred about their use at trial:

> "THE COURT: At the trial, there were text messages that were referred to. They were not offered by the State, and they were not admitted based on the—my review of the record.

[DEFENSE COUNSEL]: They were attempted to be offered, your Honor. And that's when I again objected, and that's when you found that it was—a foundation couldn't be made. And you had done some research evidently and did not admit them into the record, but that was after the State had already read part of them into the record.

THE COURT: Okay. The record just reflects, at least from the exhibit sheet, that they weren't offered. And whether they were offered and objected to, they're not of record. So—"

¶ 32    Other than this statement by defense counsel, the record does not reflect that the trial court conducted research or did not admit the text messages into the record based on lack of foundation—the record simply reflects that the State never offered the exhibit into evidence. Still referencing the text messages, the trial court later stated: "As I said, either they were not offered or they were offered and refused at the trial, so they're not part of the record and weren't part of the Court's consideration of the evidence in the case."

¶ 33    With respect to bench trials, it is presumed that a trial court only considers competent evidence unless the record affirmatively rebuts that presumption. *People v. Gilbert*, 68 Ill. 2d 252, 258 (1977). The rules of admissibility of evidence are the same whether a trial be had with or without a jury. *People v. Naylor*, 229 Ill. 2d 584, 603 (2008). However, in a bench trial, the trial court is also the trier of fact. When that is the case, a reviewing court presumes that the trial court considered only admissible evidence and disregarded inadmissible evidence in reaching its conclusion. *Id.*

¶ 34    The defendant does not direct this court to any portion of the record which demonstrates an affirmative showing that the trial court relied on any of the text messages in making its determination. However, even if the trial court did admit testimony regarding two text messages

11

purportedly sent to L.A. by the defendant, we believe that evidence did not run afoul of the trial court's pretrial ruling allowing limited other-crimes evidence and did not violate the mandates of section 115-7.3 of the Code.

¶ 35   Evidence of other crimes is not admissible to show the defendant's propensity to commit crimes. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, evidence of other crimes may be admitted to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" as to the crime for which he was charged. *Id.* Section 115-7.3 of the Code provides an exception to the general rule and permits the introduction of certain evidence to show propensity to commit a crime in cases where defendant is accused of certain enumerated offenses, including criminal sexual assault. 725 ILCS 5/115-7.3(a)(1) (West 2016). Under section 115-7.3(b), evidence of prior acts may be admissible and "may be considered for its bearing on any matter to which it is relevant." *Id.* § 115-7.3(b). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 36   In the present case, the State elicited testimony from L.A. that the defendant had on several occasions attempted to have sex with her while she was sleeping. Additionally, L.A. testified that the defendant had sent her text messages admitting that he had been watching videos of " 'taking advantage of drunk girls, girls sleeping, girls being humiliated, choked with cocks,' " and that that turned him on.

¶ 37   We do not believe that the elicited testimony runs afoul of the trial court's ruling on other-crimes evidence or violates section 115-7.3. The trial court ruled that the State could present evidence that the defendant attempted or performed vaginal intercourse with L.A. while

she was asleep in their residence. The elicited testimony about the defendant's text messages was offered by the State as further evidence of his assault of L.A., which the defendant denied, and to show motive as to the witness and the victim's sexual assaults. The evidence that the defendant had previously discussed with L.A., during a time when he was repeatedly penetrating her in her sleep, that he was watching videos of women being taken advantage of while sleeping and it turned him on, is relevant to L.A.'s testimony about the sexual assaults she endured during her relationship with the defendant. It is evidence that aids the trier of fact in determining whether the defendant attempted or performed vaginal intercourse with L.A., as it goes to motive. It is not in and of itself other-crimes evidence, as it evinces no crime.

¶ 38　The defendant cites *People v. Nunley*, 271 Ill. App. 3d 427 (1995), for the proposition that the evidence introduced of other crimes was improper when it was intended to portray the defendant as a man of bad character. *Id.* at 432. However, in *Nunley* the appellate court took issue with the detail and repetitive manner in which the evidence was presented, through multiple witnesses, which greatly exceeded what was required to accomplish the purpose and subjected the defendant to a mini trial. *Id*. In the present matter, one witness testified, there was no repetition of other-crimes evidence, and the text messages were admitted for an appropriate purpose other than to portray the defendant as a man of bad character. The text messages were not more prejudicial than probative as to whether he actually committed the uncharged offense against L.A. or the charged offense against E.L. The crimes the defendant was being accused of were sexual assaults. The addition of the defendant's interest in pornographic videos depicting men taking advantage of sleeping women was probative to the issue of whether the defendant took advantage of sleeping women and would not inflame the trier of fact to prejudice any more than the allegations.

13

¶ 39    Further, the testimony related to the text messages with defendant was relevant to motive as it relates to the charged crime against E.L. The defendant's preference for pornography depicting others taking advantage of women while sleeping is not evidence of other crimes, but it does tend to show that he acted on those fantasies and committed that same offense against E.L. and L.A. Nonetheless, the trial court explicitly ruled that it would only consider the evidence of text messages for purposes of their relevancy to other-crimes evidence and the defendant's sexual conduct toward the propensity evidence victim.

¶ 40    However, even if the testimony elicited by the State regarding the text messages was error, we further find the error was harmless because the trial judge explicitly stated on the record that he did not consider the other-crimes evidence in rendering his judgment. In *People v. Fletcher*, 328 Ill. App. 3d 1062 (2002), the defendant was found guilty of aggravated criminal sexual assault, and during the bench trial, the trial court allowed evidence, over the defendant's objection, that the defendant had been administered a polygraph. The trial court allowed the evidence for a limited purpose because the defendant was claiming his statements about the offense were involuntary and that the defendant had changed his story. *Id.* at 1066-67. On appeal, the defendant argued that the admission of the polygraph evidence was reversible error. *Id.* at 1072-74. However, the reviewing court pointed out that it is presumed that the trial court considers only competent evidence, as well as evidence introduced for a limited purpose for that purpose only, and this presumption is not overcome unless the record shows otherwise. *Id.* at 1075. In affirming the conviction, the *Fletcher* court observed that the trial court stated that it would not consider the polygraph evidence in reaching a judgment. *Id.* The reviewing court also found that because the record showed the court did not consider the polygraph evidence, any error in the improper introduction of evidence would be harmless error. *Id.*

14

¶ 41 Here, in denying the defendant's motion for a new trial, the trial court explicitly stated that it did not consider the text messages in reaching a judgment. The trial court was clear in its assertion: "As I said, either they were not offered or they were offered and refused at the trial, so they're not part of the record and weren't part of the Court's consideration of the evidence in the case." Thus, we conclude that even if the text messages were admitted, and that admission was in error, the error was harmless because the trial court did not consider this evidence in rendering its judgment. Accordingly, the record fails to support any claim of prejudice and defendant's argument fails.

¶ 42                                    III. CONCLUSION

¶ 43 Based on the foregoing reasons, we affirm the judgment of the trial court.


¶ 44 Affirmed.