# Illinois Official Reports

## Appellate Court

---

### *In re T.R.*, 2019 IL App (4th) 190529

---

| | |
|---|---|
| Appellate Court Caption | *In re* T.R., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. T.R., Respondent-Appellant). |
| District & No. | Fourth District<br>No. 4-19-0529 |
| Filed | December 24, 2019 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 17-JD-78; the Hon. J. Brian Goldrick, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |
| Counsel on Appeal | James E. Chadd, John M. McCarthy, and Salome Kiwara-Wilson, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Thomas R. Dodegge, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Presiding Justice Holder White and Justice Turner concurred in the judgment and opinion. |

¶ 1　　　　In April 2017, the State filed a petition for adjudication of wardship, alleging respondent, T.R. (born April 3, 2001), committed criminal sexual assault (penis to vagina) (720 ILCS 5/11-1.20(a)(1) (West 2016)), criminal sexual abuse (in that he used force to touch the vagina of I.P.-V. (born March 31, 2002)) (*id.* § 11-1.50(a)(1)), and criminal sexual abuse (in that he committed an act of sexual penetration with I.P.-V. when she was between the ages of 13 and 17 years old and respondent was less than 5 years older than I.P.-V.) (*id.* § 11-1.50(b)). In July 2018, after a bench trial, the trial court adjudicated respondent to be a delinquent minor. In December 2018, the court made respondent a ward of the court, sentenced him to 36 months' probation, and imposed 30 days of detention to be stayed pending completion of probation.

¶ 2　　　　On direct appeal, this court concluded that the trial court should have conducted a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). *In re T.R.*, 2019 IL App (4th) 190051, ¶ 48, 127 N.E.3d 1157. We remanded for such a hearing and retained jurisdiction over respondent's remaining claims. *Id.* ¶ 51.

¶ 3　　　　On remand, the trial court conducted a *Krankel* hearing, inquired into the allegations of ineffective assistance of counsel made by respondent's mother and respondent, and concluded those allegations did not warrant the appointment of new counsel to pursue them further.

¶ 4　　　　Respondent appeals, arguing (1) the trial court conducted an inadequate *Krankel* hearing, (2) the trial court erred by considering evidence not presented at trial, (3) respondent's counsel provided ineffective assistance by stipulating to the introduction of DNA evidence that supported the State's case, (4) the trial court erred by admitting for impeachment purposes testimony regarding statements respondent made during a polygraph examination, and (5) respondent's convictions for criminal sexual abuse should merge with his criminal sexual assault conviction pursuant to the one-act, one-crime doctrine. We agree only with respondent's fifth argument. Accordingly, we vacate respondent's delinquency adjudication for criminal sexual abuse and affirm the trial court's judgment in all other respects.

¶ 5　　　　　　　　　　　　　I. BACKGROUND
¶ 6　　　　　　　　　　　　A. The Delinquency Petition
¶ 7　　　　In April 2017, the State filed a petition for adjudication of wardship, alleging respondent was a delinquent minor and should be made a ward of the court. The petition alleged that in March 2017, respondent committed three sex crimes against I.P.-V.: (1) criminal sexual assault by placing his penis in I.P.-V.'s vagina by the use of force, (2) criminal sexual abuse by knowingly touching I.P.-V.'s vagina for the purpose of sexual gratification through the use of force, and (3) criminal sexual abuse by placing his penis in I.P.-V.'s vagina when she was between the ages of 13 and 17 years old and he was less than 5 years older than her.

¶ 8　　　　　　　　　　　　　B. The Bench Trial
¶ 9　　　　　　　　　　1. *The State's Case-in-Chief*
¶ 10　　　　In June 2018, the trial court conducted a bench trial at which I.P.-V. testified that she was then a 16-year-old high school student. In March 2017, when she was 15 years old, I.P.-V. went with her cousin, X.P., to hang out with X.P.'s boyfriend, Devan M., at his house. It was divided into two apartments, one on the main level, and one on the second level. Devan lived

on the first level while respondent lived upstairs. I.P.-V. had never been to Devan's house and did not know respondent, although she had seen him at school.

¶ 11    Upon arrival, Devan escorted the girls upstairs to respondent's apartment, where I.P.-V. met respondent. They then proceeded to the living room, where the four sat down to hang out and listen to music. I.P.-V. and respondent sat on one couch, and X.P. and Devan sat on another couch. After about 10 or 15 minutes, X.P. and Devan went to respondent's bedroom.

¶ 12    I.P.-V. testified that she and respondent continued to talk and respondent began "playing around" and "trying to pull his [penis] out." I.P.-V. told him to stop and moved to the other couch, but respondent followed her. I.P.-V. stated that she was wearing overalls with one strap undone, a sweater, and tights, with a belt over her clothes. I.P.-V. testified that respondent kept playing with her belt and, at some point, she took the belt off.

¶ 13    The two then began to fight over her overalls. She tried to keep them on, while he tried to take them off. I.P.-V. stated that at first she thought they were "play fighting," but then it started to get serious. They fell on the floor and continued to fight. I.P.-V. began hitting respondent and telling him to stop, but he picked her up and took her to what I.P.-V. called "[a] pink room." I.P.-V. identified a photograph introduced into evidence as the "pink room" and described it as such because it had pink walls and pink curtains.

¶ 14    Respondent dropped her on the bed in the pink room, and the two began fighting over her overalls and tights, with respondent pulling them down, and I.P.-V. pulling them up. I.P.-V. asked respondent if he was going to rape her. Respondent said, "No, but you going to take this dick." I.P.-V. stated that after hearing respondent's answer, she "lost hope" and "gave up." Respondent took off her overalls and tights, flipped her onto her stomach, held her hands down, and put his penis in her vagina.

¶ 15    I.P.-V. testified that this lasted about a minute, at which point respondent let her go. I.P.-V. pulled up her pants and went to the bathroom, passing X.P. and Devan on the way. They were still in respondent's bedroom. I.P.-V. stated she was crying in the bathroom, and when X.P. came in, I.P.-V. told X.P. what happened. They then decided to go to I.P.-V.'s godmother's house. Once there, they called the police, and I.P.-V. went to the hospital where staff administered a rape kit.

¶ 16    On cross-examination, I.P.-V. stated that X.P. and Devan closed the door to respondent's bedroom after them, but the door to the pink room stayed open. When she went to the bathroom, the door to respondent's room was open. I.P.-V. agreed that she and respondent were play fighting at first, "[l]aughing for a minute, but then it got serious." I.P.-V. stated that she was yelling "no" and "stop," but the music was loud. I.P.-V. acknowledged that she and X.P. went back to respondent's apartment shortly after leaving to try to get $10, which she had lost there, but I.P.-V. testified that only X.P. went back upstairs.

¶ 17    X.P. testified that in March 2017 she was talking to Devan and went with her cousin, I.P.-V., to hang out at his apartment. Upon arriving, they instead went upstairs to respondent's apartment. X.P. had never been there before and did not know respondent, but X.P. stated that I.P.-V. "seemed to be familiar with him, but not on a personal level." I.P.-V. mentioned she recognized him from school.

¶ 18    X.P. testified that the four of them went to the living room to listen to music and two of them sat on each couch. The music was loud, but X.P. stated they were able to have a conversation over the music using "regular voices." X.P. testified that everybody was getting

along and "it was just all good vibes." I.P.-V. and respondent were being playful and pushing each other. Respondent would try to put his arm around I.P.-V., and she would push his arm away.

¶ 19    X.P. testified that after about 20 to 30 minutes, she and Devan went to a bedroom near the front door. Devan closed the door, and the two turned on the TV. X.P. could still hear music from the living room but not any conversation. After another 20 to 30 minutes, X.P. went to the living room to check on I.P.-V., but she did not see I.P.-V. or respondent. However, X.P. heard "the same kind of like yelling that [I.P.-V.] was doing when we were in the living room, like telling [respondent] to stop and stuff like that." X.P. assumed the yelling was coming from a bedroom off the living room. X.P. returned to Devan but left the door open.

¶ 20    About 10 minutes later, X.P. saw I.P.-V. walk by at a fast pace. I.P.-V. was crying, her hair was undone, and she was not wearing her overalls. X.P. went to the bathroom and found I.P.-V. crying and speaking at a fast pace, saying, "He wouldn't stop. He wouldn't stop." The two gathered I.P.-V.'s things and left. As soon as they got downstairs, I.P.-V. realized she was missing $10, so they both returned to respondent's apartment to look for it.

¶ 21    On cross-examination, X.P. further described the type of yelling she heard from the bedroom when she went to check on I.P.-V. as follows:

"Q. Okay. You heard some yelling, but you thought it was still playful; is that right?

A. Yes. Like, [I.P.-V.], my cousin, tends to be a loudmouth. So, when we were in the living room and she was talking about, Oh, stop, stop, she was doing it in, you know, like a high voice level. And so, when they went into the room, I was expecting that she was doing the same thing."

¶ 22    The State then offered a stipulation between the parties into evidence. The stipulation indicated that Dana Yenko, a DNA analyst with Bode Cellmark Forensics, conducted testing on a sexual assault kit. Yenko prepared a report containing her findings and conclusions, and a copy of that report was attached to and submitted as part of the stipulation. When asked if the stipulation was correct, respondent's counsel stated, "We certainly do have some argument eventually with regard eventually to the results and how those came about. But that—as far as the evidence portion, that is correct, the stipulation is there."

¶ 23    The report itself indicated that "[t]he DNA profile obtained from the sperm fraction (SF) of [the vaginal swab sample] is consistent with a mixture of two individuals including the victim and one male contributor." The report concluded that the "deduced male component DNA profile matches the DNA profile obtained from [respondent's] sample." Footnote three to the report indicated that "[a]ny reference to body fluids in evidence descriptions are based on the written descriptions of the samples by the submitting agency."

¶ 24                    2. *The Respondent's Case*

¶ 25    Respondent's mother testified that she lived in the apartment with respondent and his younger sister. She described how sound travels in the apartment. She stated that even with all the TVs on in the house, she often yelled for her daughter from her bedroom in the back, and her daughter would hear and respond from the pink bedroom in the front of the house.

¶ 26    Devan testified that he was respondent's cousin and lived in the apartment below respondent. Devan stated he was friends with X.P. and had seen I.P.-V. around the neighborhood, but he was not friends with her. In March 2017, X.P. and I.P.-V. came to

Devan's downstairs apartment, and the three of them went upstairs to respondent's apartment because it had more room. The four of them sat down in the living room, two on each couch, and listened to music. Devan testified that I.P.-V. and respondent were flirting, engaging in "friendly banter, like playing around." Devan described their physical interactions as "like, you know, how like kids wrestle[ ] and like play around."

¶ 27    Devan stated that he and X.P. went to respondent's bedroom to talk and watch TV. He stated the door remained open and they were in the bedroom together for about 15 minutes. Neither he nor X.P. left the room. Devan saw I.P.-V., fully clothed, walk past the bedroom door with her hands over her eyes. Devan left the room and asked respondent what happened, while X.P. went to the bathroom to talk to I.P.-V. The girls went downstairs to the front porch but came back upstairs to look for $10 before leaving for good.

¶ 28    On cross-examination, Devan conceded that he earlier gave a statement in which he said I.P.-V. was crying when she walked past the bedroom. Devan also recalled that respondent said, "He wasn't feeling [I.P.-V.]" when Devan asked what happened. Respondent indicated I.P.-V. got upset when respondent told her "he wasn't feeling it." On redirect, Devan stated he did not hear any yelling or anyone say "no" or "stop." Devan opined that, based on his familiarity with the apartment, he would have heard if anyone had yelled.

¶ 29    Respondent testified that he was alone when Devan, X.P., and I.P.-V. appeared at his door, asking to come in. Respondent recognized I.P.-V. from school but did not know her. He did not recognize X.P. Respondent let them in, and the four went to the living room where they sat as couples on the couches. After talking for a few minutes, someone connected a phone to a portable speaker and began playing music. The group continued to talk, and 10 to 15 minutes later, X.P. and Devan went to respondent's room. Respondent recalled that the door was left open.

¶ 30    Respondent testified that while the four of them were sitting in the living room, he and I.P.-V. "were roughhousing, like playing around, like flirting, like kidding each other, and stuff like that, but nothing major." Respondent described the behavior as "playful." After X.P. and Devan left, respondent and I.P.-V. continued to "play[ ] around" and eventually moved to the other couch. According to respondent, I.P.-V. was sitting next to him on his right. The two continued "fighting" and "hitting each other, stuff like that. But then eventually, like she placed her hand on my right thigh." Respondent testified there was no conversation, but I.P.-V. kept saying "I hope you know you are not getting nothing."

¶ 31    Respondent stated they continued to flirt and I.P.-V. placed her left hand on his inner right thigh. Respondent reciprocated, placing his right hand on her left thigh. Respondent explained that I.P.-V. kept moving her hand closer to his penis and he moved his hand closer to her vagina. Respondent thought to himself that she was sending "mixed signals." Eventually, I.P.-V. placed her hand down respondent's pants and rubbed his penis. Respondent put his hand down her pants and touched her vagina. Respondent denied placing his fingers inside her vagina. Respondent stated that they touched each other for about five minutes before she took her hand out of his pants, stood up, and went to the bathroom. Respondent denied (1) putting his penis in her vagina, (2) going to the pink room, and (3) having any type of struggle.

¶ 32    I.P.-V. came out of the bathroom, and as she passed respondent's room, X.P. and Devan came out of that room. X.P. asked I.P.-V. what was wrong, and Devan asked respondent what happened. Respondent said, "Nothing happened," and that he "really wasn't feeling like her." Respondent then indicated to everyone he was getting ready to leave, and I.P.-V. grabbed her

- 5 -

phone, charger, and belt, and the girls left. They came back upstairs about two minutes later to briefly look for $10 that I.P.-V. said she lost.

¶ 33    On cross-examination, respondent agreed that the touching was sexual in nature, but he denied that he ever placed his finger inside I.P.-V.'s vagina. Respondent admitted that although he told Devan nothing happened, that statement was not true. Respondent explained that when he said he "wasn't feeling [I.P.-V.]," he meant that he never "felt something with her [emotionally]."

¶ 34    Respondent testified that I.P.-V. got up without saying anything and he did not cause her to leave the room. Respondent stated there was no reason for I.P.-V. to be crying or for X.P. or Devan to be concerned about her. Respondent also stated he did not know why X.P. and Devan asked what happened.

¶ 35    Respondent denied three times that he made any previous statements in this case. (Apparently, the State was attempting to ask respondent if he had made a prior inconsistent statement.) The State then asked if respondent knew "an individual named Steve Woody," and respondent answered "[t]he polgraphic [sic] guy." Respondent's counsel objected, arguing the State was trying to introduce inadmissible polygraph evidence. The State responded that it was simply trying to use statements made during a polygraph examination for purposes of impeachment, which would be admissible. Respondent's counsel then argued that the State's asking impeachment questions would open the door to the introduction of polygraph results. Counsel also claimed the State was not allowed to impeach respondent with polygraph statements. In response, the State maintained (1) it was not trying to offer the results of any polygraph test and (2) admitting the statements to impeach would not open the door to inadmissible polygraph evidence.

¶ 36    The trial court agreed that the results of a polygraph are not admissible in Illinois and stated it would not hear such testimony or consider such evidence. The court further agreed with the State that any prior inconsistent statements were admissible even if made to a polygraph examiner, and the court ruled that it would permit the State to inquire further. The court made clear it was "not considering any results of polygraph examination. I'm not considering anything with respect to any type of examination that was done or performed."

¶ 37    The trial court also stated it would not rule definitively on the issue at that time and would permit respondent to provide case law in support of his position. The court stated it would then strike the testimony if the court agreed with respondent.

¶ 38    After further questioning, respondent acknowledged making several statements to Woody, including that he told Woody (1) "nothing sexual happened" between himself and I.P.-V. and (2) he did not know why I.P.-V. was making these allegations. Respondent agreed he did, in fact, touch I.P.-V. sexually, but he denied that his testimony at trial describing what happened was contrary to the statements he made to Woody. Respondent also repeatedly denied touching I.P.-V. with his penis.

¶ 39    On redirect, respondent explained that when Woody had asked him "if anything sexually happened," respondent thought Woody was asking specifically about sexual intercourse. Respondent explained that the type of touching testified to at trial was not what he understood Woody to be asking about when they spoke. Finally, respondent described where X.P. and I.P.-V. looked for the missing $10 when they came back up to the apartment and noted that they did not look in the pink room.

¶ 40                                    3. *The State's Rebuttal Evidence*

¶ 41        The State indicated it believed there was one statement respondent denied making about
which the State wished to perfect impeachment. The State called Woody and asked if he
worked locally. Woody answered, "I do. I'm a polygraph examiner." Woody testified he had
had contact with respondent and identified him in court. The State then asked if Woody recalled
his contact with respondent, and Woody stated, "Yes, his attorney contacted me, and *** we
had arranged a polygraph exam for [respondent]." The State then asked if Woody wrote a
report concerning that contact and if he reviewed the report prior to trial. Woody responded
affirmatively to both questions. The State asked Woody if respondent told him that respondent
"has no idea why [I.P.-V.] *** is saying this happened when it didn't," and Woody responded,
"That's correct." (We note that Woody's testimony on this point—namely, that respondent had
no idea why I.P.-V. accused him of sexual assault—does not appear to be inconsistent with
respondent's trial testimony, and therefore would not normally be appropriately elicited.
However, neither party has raised this issue on appeal, and the trial court, in its thorough review
of the evidence, did not mention the allegedly inconsistent statement at all.)

¶ 42                                    4. *Closing Arguments*

¶ 43        The State argued that I.P.-V.'s story was corroborated by X.P. and Devan because they all
agreed that I.P.-V. was crying or upset shortly before leaving. Respondent, meanwhile,
testified she was not crying and had no reason to be upset. The State asserted the events made
no sense unless I.P.-V. had been assaulted. The State also believed the DNA evidence
demonstrated that an act of sexual penetration occurred because (1) the DNA profile from the
"male component" of the "sperm fraction sample" matched respondent and (2) that sample
came from the vaginal swab of I.P.-V.

¶ 44        Respondent highlighted the inconsistencies in the testimony and pointed out that no one
heard any yelling, despite testimony that sound carries easily throughout the apartment.
Regarding the DNA evidence, respondent's counsel argued as follows:

> "I agreed to the stipulation basically for the language, one reason only. The State has
> made mention of sperm fractions. Sperm fractions that are mentioned on page 2 of 3 of
> the Bode Cellmark report. *** Now the only reason I agreed to even enter that is in
> Note Number 3, also on page 2 of 3, that note reads: Any reference to body fluids in
> evidence descriptions are based on the written descriptions of the samples by the
> submitting agency, which mean, basically, that when they say its sperm fluid, that's
> because they are being told by someone it's sperm. That isn't necessarily the case. DNA
> test talks about DNA. What the results the Court can conclude is, there was some of
> [respondent's] DNA in the vaginal swab, but you can't necessarily conclude it was
> sperm. It could come from saliva, if there was oral sex, or from epithelial DNA, skin,
> if, as there was what [respondent] indicated, fingering going on inside the labia ***.
> And if it is true—that's why we don't have our experts here—there was some of
> [respondent's] DNA in the vaginal swab that is scientifically proven. There is no
> question about it."

¶ 45        In reply, the State argued to the trial court that respondent's contentions about the DNA
evidence were not correct. The State first noted that "Note Number 3" referred to agency
descriptions on page one of the report in a table describing each one of the samples and where
they came from, but the sperm fraction was mentioned on page two of the report, which

described the results of the testing. The State then asserted that "[n]owhere on the agency description does it say the word 'sperm fraction,' because you cannot tell it is sperm without doing a test." The State asserted that, because respondent denied ever touching I.P.-V. with his penis, the only way the sperm fraction, which matched respondent, could be present on the vaginal swab was if I.P.-V.'s story was true.

¶ 46    The trial court took the case under advisement and continued the matter for a hearing on the polygraph evidence and its factual findings.

¶ 47                                C. The Trial Court's Ruling

¶ 48    In July 2018, the trial court conducted a hearing to issue a ruling on the State's charges. However, before addressing the evidence, the court stated that it received an envelope from respondent's mother but had not opened it. The court then gave the letter to respondent's counsel, who read it and asked for a sidebar. Counsel then informed the court at the sidebar that (1) respondent's mother complained about his performance, (2) counsel believed the court should be aware of this, and (3) the court needed to address the issue. The State responded that the issue should be raised on appeal. Respondent's counsel suggested he would "hang on to this. [We h]ave a ruling pending, and I can supplement the record if necessary." The trial court responded, "All right," and did not refer to the envelope or issue again.

¶ 49    The trial court then addressed respondent's argument regarding the polygraph evidence and concluded the testimony was admissible for the purpose of impeachment as a prior inconsistent statement. The court emphasized that it was "not considering anything with respect to Mr. Woods' [*sic*] occupation and what occurred between [respondent] and Mr. Woods. I'm only considering the statement that had been made to Mr. Woods." The court noted (1) this was a bench trial and not a jury trial, (2) respondent had a chance to explain the statement, and (3) the court would not have learned about the polygraph examination but for respondent's mentioning it on cross-examination in response to a question by the State.

¶ 50    Respondent's counsel sought to supplement the record with a copy of the polygraph examination, not for the trial court to consider, but to provide the appellate court with a record of the statements. The State objected, and the trial court agreed with the State that supplementing the record with the polygraph examination would be improper and unnecessary.

¶ 51    The trial court then recounted in detail the testimony of the witnesses at trial. The court believed that, based on the conflicting testimony of respondent and I.P.-V., the question was whether the conduct that occurred was "consensual or nonconsensual." The court began by addressing testimony that stood out and was particularly relevant to the court. First, the witnesses agreed that there was flirting and play fighting that occurred when they were together in the living room. The court viewed respondent's actions as trying to gauge I.P.-V.'s interest in him. The court also noted that the undisputed testimony was that X.P. and Devan went to a bedroom. The court found that the door was closed, the TV was on, and those two were talking "and maybe more." The court also believed X.P.'s testimony that she left the room, saw no one in the living room, and heard someone say "stop." The court then found as significant (1) I.P.-V.'s statements in the bathroom that "he wouldn't stop," (2) Devan's "view of her behaviors and his questioning of [respondent] as to what happened, and [(3)] the statement made by [respondent] to Dev[a]n that he wasn't feeling it." The court explained that it viewed that comment as respondent's stating there was no emotional connection, which was what I.P.-V. was upset about.

¶ 52    The trial court then focused on the testimony that indicated I.P.-V. was upset, particularly that she was so upset she told her godmother, went to the hospital, and called the police. The court stated it "d[id]n't believe that she would simply be upset about him not being into her, having just met one another, and being together on that afternoon in question." The court further stated it did not think I.P.-V. would "go to [the] extremes" of contacting the authorities and going to the hospital if she were simply upset by a rejection, and therefore the court did not believe respondent's explanation, although it admitted it was "possible." The court believed the explanation for I.P.-V.'s actions "lie[d] in the evidence stipulation" regarding the DNA evidence.

¶ 53    The trial court stated that the male DNA profile obtained from the sperm fraction found on the vaginal swab was consistent with respondent. The court then explained the terminology of the report, as follows:

"The sperm fraction is simply defined as two semen separations. The one containing sperm is called the sperm or the male fraction. It may contain no male DNA if no intact sperm cells are present in the semen. If there's semen detected, if it's present, it may not necessarily contain intact sperm cells. So, for example, if a male has had a vasectomy or is incapable of producing sperm, then sperm would be absent from the semen.

Court would note that for successful DNA typing, intact sperm cells in this situation have to be present in the semen. Vaginal swab conducted by the lab indicates [respondent's] DNA as being present. And that's based upon the processing and examination of the vaginal swab of the vaginal/cervical specimen that was taken.

Given that, the Court believes the evidence supports that there was sexual penetration on that evening in question or that afternoon in question based upon the testimony of [I.P.-V.] and the results of the lab test. [Respondent] indicates that there was no sexual intercourse, no sexual penetration that had occurred. [I.P.-V.] says there was and that she didn't consent to it. It was unconsensual. Court thinks the lab results support that testimony."

¶ 54    The trial court then concluded that respondent was guilty of all three offenses alleged in the petition. The court addressed each offense individually and concluded that all of the elements had been proved beyond a reasonable doubt. Regarding the second offense, criminal sexual abuse (forceful touching of I.P.-V.'s vagina), the court stated that "[w]hile [respondent] indicated that he did touch [I.P.-V.'s] vagina with his hand, [I.P.-V.] only testified with respect to the act of sexual penetration ***. Court believes that certainly her vagina was touched by [respondent's] penis. So, based upon that, the Court is finding that allegation proven beyond a reasonable doubt as well." The court adjudicated respondent to be a delinquent minor and continued the matter for sentencing.

¶ 55                                D. The Sentencing Hearing

¶ 56    In December 2018, the trial court conducted a sentencing hearing. Before announcing the sentence, the court noted that it based its finding of guilt on the evidence "including what I would classify as the scientific evidence, which in my mind leaves no dispute as to what occurred based upon the rest of the evidence that was presented." The court found it was in respondent's best interest and the best interest of the public that he be made a ward of the court. The court imposed the statutory minimum sentence of 36 months' probation and imposed 30

days of detention to be stayed pending completion of probation.

¶ 57                                E. The Initial Appeal
¶ 58        In respondent's initial direct appeal to this court, he raised the same five claims he raises in this appeal, except that he contended a *Krankel* hearing should have been conducted. We concluded that (1) *Krankel* applies to juvenile proceedings, (2) respondent's mother could and did sufficiently raise the issue, and (3) the trial court should have conducted a *Krankel* hearing. We then remanded the matter for further proceedings and retained jurisdiction over respondent's remaining claims. *T.R.*, 2019 IL App (4th) 190051, ¶ 48.

¶ 59                             F. The *Krankel* Proceedings
¶ 60        In June 2019, the trial court conducted a status hearing following the issuance of this court's mandate. The court informed the parties that it would be conducting a *Krankel* hearing and requested a copy of the letter from respondent's mother complaining of counsel's performance, which counsel provided to the court and the State. The court continued the matter to review this court's opinion in preparation for the *Krankel* hearing.

¶ 61                           1. *The Trial Court's Inquiry*
¶ 62        Later in June 2019, the trial court conducted a *Krankel* hearing. The court noted it had reviewed respondent's mother's letter, transcripts of prior hearings, this court's opinion, and relevant case law. The court stated that its "inquiry is for the sole determination as to whether or not counsel should be appointed to represent the minor to further investigate the claims as set forth in the letter that was filed." It then identified four issues it gathered from the letter and explained it would allow respondent's mother to first address them, then respondent, and then trial counsel.
¶ 63        The only issue relevant to this appeal that the letter raised concerns counsel's decisions regarding the DNA evidence. Respondent's mother primarily indicated she was upset with the timeliness and manner in which the DNA testing occurred. In particular, she was unhappy that (1) the testing took so long to complete, (2) the State did not get a sample from respondent in a timely fashion and instead showed up at his school months later to get the sample, (3) the testing was not conducted by an Illinois lab, and (4) although many items were taken from the pink bedroom for testing, none of them were ever tested. She further stated that counsel had the results reviewed by a third party who indicated "the process was done sloppy and it was rushed."
¶ 64        Regarding counsel, respondent's mother complained that her biggest problem was counsel's stipulating to the entry of the DNA results because counsel essentially agreed to evidence that helped the State's case. She further stated that, although she was unclear on the specifics, her understanding was that counsel and the State made an agreement, but the State "did something totally different in court" that was not in accordance with that agreement.
¶ 65        The trial court then discussed with respondent's mother the remainder of the issues presented in her letter. We note the court asked many clarifying questions and allowed respondent's mother to speak at length.
¶ 66        The trial court then asked respondent if he had anything to add to his mother's statements regarding any of the four issues discussed. Respondent stated he was also unhappy that the

State took such a long time to get his DNA sample and that the testing was "outsourced." Respondent stated his mother told counsel she wanted the testing done "in town, and it still came back outsourced."

¶ 67  The trial court then allowed counsel "the opportunity to respond" with respect to the DNA issue. Counsel agreed with respondent's mother that he was frustrated with (1) the testing delay, (2) the outsourcing, and (3) the failure to test other items, but he did all he could to prevent those problems. Counsel explained that he received permission to have the results of the DNA testing reviewed by an independent examiner in Lombard, Illinois, the only lab not operated in Illinois by the state police. The lab was called "Independent Forensics," and the examiner was named "Dr. Karl A. Reich." Counsel then stated as follows:

> "And as a result of his examination, [Dr. Reich] found the following: It is true that there was some background sloppiness, according to what he says, in the issue of the DNA testing samples. However, what he informed me also was that he could not come, he could not disagree with the results of the Bode Cellmark labs, specifically to the effect of finding DNA from [respondent] in the vaginal, cervical swabs. And at that point, because of that, I made a, what I considered a trial decision not to call Dr. Reich as a witness but instead to try to go via the stipulation to reduce the impact of that testimony in that I didn't want to call our witness who would then say that his results of his examination agreed with the State's DNA lab, essentially saying, yes, that's [respondent's] DNA in the vaginal swab of [I.P.-V.] I did not believe that would be a good trial strategy having our expert essentially verify what the State's lab had done. Again, I wasn't happy with the timing of it, I wasn't happy that there was some sloppiness; but he said that did not, when he spoke to me, Dr. Reich said he didn't say that that would negate any of the results. And at that point that was a key point as far as DNA goes. As to why the other matters weren't sent to Bode or tested, that I don't know."

¶ 68  The trial court then gave counsel the opportunity to respond to the remaining three issues raised but did not ask any questions of counsel. When asked if he had anything else to add, counsel stated that it had "always been a pleasure dealing with" respondent and his mother and that "[s]he has been an extremely active parent, more so than just about anyone else I've ever dealt with in court; and that is a compliment, not a criticism."

¶ 69  The trial court then indicated it would take the matter under advisement, review the letter and notes from the hearing, and review the notes from trial. It reiterated that "the only issue for the Court to decide is whether to appoint other counsel for the minor to address the issues that were raised in the context of this letter and based upon the Court's inquiry today."

¶ 70  *2. The Trial Court's Findings*

¶ 71  In July 2019, the trial court convened the continued *Krankel* hearing to announce its findings. The court began by addressing the other issues raised in the mother's letter and the court's inquiry and stated it found those issues were legally immaterial or matters of trial strategy. (We note again that this portion of the trial court's ruling is not challenged on appeal.)

¶ 72  The trial court then addressed what it considered to be the "primary issue," which was the DNA evidence. The court recounted the complaints made by respondent's mother and then stated as follows:

"As to the results of the DNA testing, that was obviously of concern by [respondent's mother] and I received comment from [trial counsel] about why he proceeded in the manner that he did on the date in question, that being the trial. I don't find that a delay in taking the DNA swab from the minor, obtaining the results, the testing procedures, and that it was farmed out are such that it's an issue at this stage of the proceedings that the court would have to appoint separate counsel to investigate. I think ultimately the question is the manner in which the DNA results were delivered to the court. It was done by way of stipulation. And the stipulation was such that the DNA testing came back indicating that it was the minor's DNA that was found in the vaginal swabs of the alleged victim or victim [I.P.-V.] Those results were explored by an independent party, I would say retained by the public defender's office, it's an independent office. Mr. Reich was the one who did the examination and according to what was presented, while there was concern about what was termed sloppiness in the manner in which things were provided to the ultimate lab for testing, it was such that he opined according to counsel that it did not affect the results of the DNA testing. [Trial counsel] made the determination not to have Mr. Reich testify and again stipulated to the findings of the lab up to the point where Mr. Reich had actually examined what was presented to him. The court believes in this case that again, that was a matter of trial strategy by [trial counsel] as to how to present that information and what testimony was and should have been presented on the date of the trial with respect those issues. And again, the court cannot say that the decisions were object[ive]ly unreasonable so as to require the court to appoint counsel to further explore the claims on that issue."

¶ 73    This appeal followed.

¶ 74                                II. ANALYSIS

¶ 75    Respondent appeals, arguing (1) the trial court conducted an inadequate *Krankel* hearing, (2) the trial court erred by considering evidence not presented at trial, (3) respondent's counsel provided ineffective assistance by stipulating to the introduction of DNA evidence that supported the State's case, (4) the trial court erred by admitting for impeachment purposes testimony regarding statements respondent made during a polygraph examination, and (5) respondent's convictions for criminal sexual abuse should merge with his criminal sexual assault conviction pursuant to the one-act, one-crime doctrine. We agree only with respondent's fifth argument. Accordingly, we vacate respondent's delinquency adjudication for criminal sexual abuse and affirm the trial court's judgment in all other respects.

¶ 76                    A. The *Krankel* Hearing Was Adequate

¶ 77    Respondent first argues that the trial court did not conduct an adequate inquiry into counsel's performance regarding the DNA evidence stipulation because it did not ask any questions about Reich's opinion. Specifically, respondent contends that if Reich had be called to testify, he might have testified either (1) there were errors in the testing procedure or (2) there was support for trial counsel's argument that the State's report regarding respondent's DNA did not necessarily mean that it was sperm DNA. Respondent claims the court's failure to ask for more detail about Reich's opinion or potential testimony meant that the court could not determine whether trial counsel's decision to stipulate to the State's report was objectively

reasonable.

¶ 78                    1. *The Applicable Law and Standard of Review*

¶ 79    The only question a trial court must answer after conducting a *Krankel* hearing is whether to appoint independent counsel to represent the defendant on his ineffective assistance claims. *People v. Roddis*, 2018 IL App (4th) 170605, ¶ 47, 119 N.E.3d 52, *appeal allowed*, No. 124352 (Mar. 20, 2019). The court need not appoint new counsel if the defendant's claims are without merit or pertain solely to matters of trial strategy. *Id.* ¶ 58. To determine whether new counsel is required, a trial court should ordinarily inquire into the factual basis of the defendant's claims by (1) asking the defendant about the claims, (2) asking defense counsel about the claims, and (3) relying upon its knowledge of counsel's performance. *Id.* ¶¶ 58-59.

¶ 80    " 'The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel.' " *People v. Ayres*, 2017 IL 120071, ¶ 13, 88 N.E.3d 732 (quoting *People v. Moore*, 207 Ill. 2d 68, 78, 797 N.E.2d 631, 638 (2003)). An inquiry is adequate when it meets the goals and primary purpose of a *Krankel* hearing. See *id.* The Illinois Supreme Court has repeatedly explained that "the goal of any *Krankel* proceeding is to facilitate the trial court's full consideration of a defendant's *pro se* claim and thereby potentially limit issues on appeal." *Id.* "[T]he primary purpose of the preliminary inquiry is to give the defendant an opportunity to flesh out his claim of ineffective assistance so the court can determine whether appointment of new counsel is necessary." *Id.* ¶ 20. "By initially evaluating the defendant's claims in a preliminary *Krankel* inquiry, the circuit court will create the necessary record for any claims raised on appeal." *People v. Jolly*, 2014 IL 117142, ¶ 38, 25 N.E.3d 1127.

¶ 81    The appellate court reviews *de novo* the manner in which a trial court conducted its inquiry into defendant's *pro se* claims. *People v. Lawson*, 2019 IL App (4th) 180452, ¶ 43.

¶ 82                                   2. *This Case*

¶ 83    We conclude the trial court conducted an adequate inquiry into respondent's claims. The record demonstrates the court allowed respondent's mother to elaborate extensively on all of the various claims of ineffectiveness raised in her letter to the court. The court also picked up that the most significant issue was trial counsel's handling of the DNA evidence, and it asked numerous questions in an effort to pin down the specific claims regarding counsel's alleged shortcomings. Respondent's counsel gave a lengthy explanation of his actions regarding the DNA evidence and specifically delineated his thought process concerning how to handle the evidence at trial. Given this record, the trial court complied with the purpose of *Krankel* hearings by (1) allowing respondent to flesh out the factual basis of his claims and (2) creating a record that permits appellate review. See *Ayres*, 2017 IL 120071, ¶¶ 20-21.

¶ 84    The trial court found that respondent did not present evidence of possible neglect of the case by trial counsel such that it was required to appoint new counsel to investigate. Trial counsel acknowledged the delay in both getting a sample from respondent and receiving results of the testing. He also noted that he did not know why the other materials were not tested. However, trial counsel explained to the trial court that, despite any "sloppiness" in the testing, the local independent expert would have testified consistently with the State's witness. Counsel explained he decided to introduce the stipulation in an effort to minimize the effect of the evidence.

¶ 85        Neither respondent nor his mother stated the independent expert's report was actually favorable to respondent or that counsel was misstating the results. Respondent, his mother, and his counsel were largely in agreement regarding the timing of the DNA evidence, but counsel did not see any way to use the timing to challenge the evidence, and the trial court agreed with counsel's representations. Given this context, further questioning by the court was unnecessary, and the court appropriately determined that there was no need to appoint new counsel to investigate the ineffective assistance allegations of respondent and his mother.

¶ 86        We acknowledge that matters of trial strategy are typically more difficult to assess than other issues in *Krankel* hearings. That is because the trial court is not deciding whether a particular strategy was wise and is not evaluating counsel's ultimate performance. Instead, as the trial court recognized here, the sole question is whether there is possible neglect of a case such that new counsel should be appointed to investigate further. With matters of trial strategy, the question is whether the representations made at the *Krankel* hearing are sufficient to demonstrate that trial counsel may have acted objectively unreasonable, requiring the appointment of new counsel. *Roddis*, 2018 IL App (4th) 170605, ¶ 77. Based on all the information in the record, we believe the trial court conducted an adequate inquiry to assess whether new counsel needed to be appointed on respondent's claim of ineffective assistance, and the trial court's conclusion that no new counsel need be appointed was appropriate.

¶ 87        We also note that a trial court generally has broad discretion over the manner in which it conducts hearings. See, *e.g.*, *People v. Owen*, 299 Ill. App. 3d 818, 823, 701 N.E.2d 1174, 1178 (1998) (explaining trial court has "vast discretion" over hearings on motions *in limine* and offers of proof including over (1) how the hearing will proceed, (2) the type of testimony or evidence, and (3) how detailed the examination). When, as here, the trial court has properly conducted a *Krankel* inquiry, issues pertaining to the court's decisions to pursue certain lines of questioning and not others or how thoroughly to inquire about certain claims may be more appropriately reviewed for an abuse of discretion. See *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 71 (explaining that the Illinois Supreme Court has used permissive instead of mandatory language when describing the methods of conducting a *Krankel* inquiry).

¶ 88        For example, in *People v. Williams*, 147 Ill. 2d 173, 253, 588 N.E.2d 983, 1015 (1991), the supreme court rejected defendant's claim that trial court erred by failing to have an interchange with defense counsel at the *Krankel* hearing. The court concluded that defendant was not prejudiced "since apparently neither defense counsel nor the trial court felt such [a discussion] was necessary to enable counsel to rebut defendant's charges." *Id*. Accordingly, the Illinois Supreme Court affirmed the trial court's decision not to appoint new counsel because it "conducted a proper examination of the factual bases for defendant's claims, finding them meritless, and defendant's allegations revealed no possible neglect." *Id.* In this case, regardless of the standard of review applied, we likewise conclude that the trial court's decision not to question trial counsel further was entirely appropriate because the court conducted a proper inquiry into respondent's claims, which did not demonstrate possible neglect such that new counsel needed to be appointed.

¶ 89                        3. *Possible Issues With* Krankel *in Juvenile Delinquency Cases*

¶ 90        Recently, the Illinois Supreme Court highlighted a potential issue in *Krankel* cases. In *People v. Bates*, 2019 IL 124143, ¶ 32, the supreme court rejected the idea that defense counsel could raise his own ineffectiveness, in part because it may require a court "to inquire into

privileged matters. Courts would have to question whether counsel's actions are strategies, which would potentially force them to inquire into privileged matters and perhaps sow seeds of doubt into a defendant's mind as to a strategy to which he previously agreed." Accordingly, the supreme court held "that the trial court is required to inquire into counsel's effectiveness only upon a clear claim of ineffective assistance by a *pro se* defendant or by an attorney at the defendant's direction." *Id.* ¶ 33. The First District recently stated (in a thorough and well-reasoned opinion) that if a defendant does not wish to raise an ineffectiveness claim that was brought to the trial court's attention by a third party, "the defendant can simply say so." *People v. Downing*, 2019 IL App (1st) 170329, ¶ 43.

¶ 91    In juvenile delinquency cases, such as this one, "[t]he purpose of a parent's presence is to ensure the juvenile his right to counsel and his right to have his parents present at any hearing." *In re J.E.*, 285 Ill. App. 3d 965, 980-81, 675 N.E.2d 156, 167 (1996). This is why we concluded in the earlier appeal in this case that a parent may raise a claim of ineffectiveness that will trigger a *Krankel* inquiry (*T.R.*, 2019 IL App (4th) 190051, ¶¶ 46-47), and we see nothing in *Bates* that requires us to reconsider that conclusion. However, when a trial court hears *from a third party* that a defendant (or respondent) has alleged ineffective assistance, it may be helpful for a trial court to inquire whether the defendant *in fact* agrees that he has a complaint about his counsel. If he does not, no *Krankel* hearing is necessary. If he does, the trial court may wish to admonish the defendant, briefly, that by asserting an ineffectiveness claim, he is waiving his right to attorney-client privilege, meaning that his trial counsel may be required to divulge matters of trial strategy, as well as otherwise privileged communications from defendant.

¶ 92                                    B. Material Not in Evidence

¶ 93    Next, respondent argues the trial court committed plain error when it considered facts outside of the record in order to adjudicate respondent a delinquent minor. Respondent contends the court relied heavily on the DNA evidence to determine witness credibility. When giving its ruling, the court discussed the meaning of the term "sperm fraction" and noted that the presence of sperm was required for successful DNA typing. Respondent points out that neither party presented any evidence that would support the court's assertions. Respondent claims the court's reliance on evidence outside of the record constituted a due process violation and therefore plain error.

¶ 94    The State responds that the trial court's ultimate conclusion that sperm matching respondent's DNA was found in the vaginal swab was supported by the evidence stipulation. The State contends the trial court made this specific finding prior to any statements respondent claims were outside of the record and those comments "do not enhance the significance of the DNA test results." Alternatively, the State asserts that the court's comments do not rise to the level of structural error.

¶ 95                                    1. *The Applicable Law*

¶ 96    When a defendant fails to object either at trial or in a posttrial motion to a perceived error, any alleged error is forfeited. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. However, under the plain-error doctrine, a reviewing court will address forfeited challenges when a clear or obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant ***, or (2) *** the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial

process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.* "The defendant bears the burden of persuasion at all times under the plain-error doctrine. [Citation.] If the defendant fails to meet his burden, the issue is forfeited, and the reviewing court will honor the procedural default." *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 55, 115 N.E.3d 270.

¶ 97    "A determination made by a trial judge based upon private investigation or private knowledge, untested by cross-examination or the rules of evidence, may result in the deprivation of due process of law." *People v. Pellegrini*, 2019 IL App (3d) 170827, ¶ 64 (citing *People v. Wallenberg*, 24 Ill. 2d 350, 354, 181 N.E.2d 143, 145 (1962)). "Due process does not permit [the trial court] to go outside the record *** or conduct a private investigation in a search for aids to help him make up his mind about the sufficiency of the evidence." *People v. Yarbrough*, 93 Ill. 2d 421, 429, 444 N.E.2d 493, 496 (1982). "A judge need not give controlling weight to the improper evidence to trigger *** reversal; even giving 'very little weight' is improper." *People v. Dameron*, 196 Ill. 2d 156, 178, 751 N.E.2d 1111, 1124 (2001) (quoting *People v. Simms*, 121 Ill. 2d 259, 274, 520 N.E.2d 308, 314 (1988)).

¶ 98    "A trial court will be accorded every presumption it considered only admissible evidence in reaching a conclusion." *Pellegrini*, 2019 IL App (3d) 170827, ¶ 64 (citing *Wallenberg*, 24 Ill. 2d at 354). That presumption "is rebutted only when it affirmatively appears that: (1) the court considered inadmissible evidence; and (2) that the court was misled or improperly influenced thereby." *People v. Johnson*, 327 Ill. App. 3d 203, 210, 762 N.E.2d 615, 622 (2001); see also *People v. Tye*, 141 Ill. 2d 1, 26, 565 N.E.2d 931, 943 (1990) ("This assumption will be overcome only if the record affirmatively demonstrates the contrary, as where it is established that the court's finding rests on a private investigation of the evidence, or on other private knowledge about the facts in the case."). "Although a judge errs in considering facts outside the record, that error is harmless when a reviewing court can safely conclude that consideration of the facts outside the record did not affect the result." *People v. Rippatoe*, 408 Ill. App. 3d 1061, 1069, 945 N.E.2d 132, 139 (2011).

¶ 99                                    2. *This Case*

¶ 100    Based upon our examination of the record in this case, two things are clear. First, the most common-sense interpretation of the DNA report is that respondent's sperm was found on the vaginal swab from I.P.-V. Second, the trial court referred to information that was outside of the record when making its findings about the DNA evidence. Thus, the question we must address is whether the record demonstrates that the outside information played a role in the trial court's conclusion that the State proved the charge against respondent beyond a reasonable doubt. We conclude that it did not.

¶ 101                        a. The Trial Court's Findings and the DNA Report

¶ 102    The trial court gave a thorough recitation of the testimony before making several specific findings. Significantly, the trial court credited X.P. and I.P.-V.'s versions of events when they conflicted with respondent's. Additionally, the court questioned how respondent's contention that I.P.-V. was upset because he was "not feeling her" could be true, given that the two did not know each other and only interacted on that particular afternoon.

¶ 103    The court found it very significant that I.P.-V. (1) told her godmother that she had been sexually assaulted, (2) contacted the police, and (3) went to the hospital and subjected herself

- 16 -

to an examination. Recognizing that I.P.-V.'s taking these actions would be rather unpleasant, the court wondered what would cause her to take such drastic steps. While acknowledging that it was "possible" that I.P.-V. would do so because respondent had rejected her, the court did not "think that was the situation" because it did not "think she would go to those extremes if that were the situation." In short, before it even mentioned the DNA evidence, the court was clearly inclined to believe I.P.-V. and not to believe respondent.

¶ 104    Nonetheless, the trial court stated it believed the "answers" to the questions it had regarding why I.P.-V. was so upset could be found in the evidence stipulation. Accordingly, the DNA evidence played some role in the court's decision making.

¶ 105    The trial court summarized the report as stating that "[t]he DNA profile obtained from the sperm of [respondent], or sample E01, according to the results were consistent with a mixture of two individuals including the victim [I.P.-V.] and one male contributor. And that male contributor is identified as [respondent]." We agree with the trial court's summation that this is the most logical inference to be drawn from the report.

¶ 106    The report states that the "profile obtained from the sperm fraction (SF) of sample [E01— the vaginal swab] is consistent with a mixture of two individuals including the victim and one male contributor." The report then states the "deduced male component DNA profile matches the DNA profile obtained from [respondent]." Although the testing process is not explained and the report does not define "sperm fraction," the most logical inferences from the plain language of the report are (1) the "male component" of the "sperm fraction" contained actual sperm, (2) the sperm was respondent's, and (3) that sperm was found in the vaginal swab from I.P.-V.

¶ 107                    b. The Information Outside the Record

¶ 108    Had the trial court said nothing further, our analysis would be over. However, the court continued on to define "sperm fraction" and to "note that for successful DNA typing, intact sperm cells in this situation have to be present in the semen." An exhaustive review of the record does not reveal any source in the record from which the trial court could have obtained this information or anything in the record from which the court could have inferred this information. The definition of "sperm fraction" is not common knowledge, and even if it were capable of being judicially noticed, the court did not indicate that it was taking judicial notice of any definition, much less where that definition came from.

¶ 109    It may be that the trial court had prior experience with DNA evidence and knew what "sperm fraction" meant. However, the court, as trier of fact, was limited to the record before it and could not rely on outside knowledge for this technical information. Accordingly, we conclude the record demonstrates that the trial court referred to information outside of the record when making its findings.

¶ 110                    c. Whether the Outside Information Affected the Result

¶ 111    Having determined the trial court did consider information outside of the record, we now address what impact that information had, if any, on the court's decision. Immediately after reciting the information outside the record, the court stated the "[v]aginal swab conducted by the lab indicates [respondent's] DNA as being present. And that's based upon the processing and examination of the vaginal swab of the vaginal/cervical specimen that was taken. Given

that, the Court believes the evidence supports that there was sexual penetration on that evening or that afternoon in question based upon the testimony of [I.P.-V.] and the results of the lab test." The court concluded that the "lab results" supported I.P.-V.'s version of events and adjudicated respondent a juvenile delinquent.

¶ 112     The trial court's statements make clear that the DNA results likely played at least some role in its determination that I.P.-V.'s testimony was credible and respondent's was not. Indeed, the court indicated as much before making its statements concerning information outside the record. Nonetheless, construing the record as a whole, we conclude that the error was harmless because we "can safely conclude [the] consideration of the facts outside the record did not affect the result." *Id.*

¶ 113     In support of our conclusion, we note (again) that the trial court made a thorough and careful review of all of the evidence in this case when it stated its findings. And those findings clearly demonstrate that the court did not believe respondent's testimony—and was strongly inclined to believe I.P.-V.—before it even considered the DNA results. In that respect, the DNA evidence merely confirmed the court's beliefs more than it persuaded the court. Further, the trial court's interpretation of the DNA report was entirely reasonable, as shown by the fact that respondent argues on appeal that his trial counsel was ineffective for stipulating to the DNA evidence because it was damaging to respondent's case.

¶ 114     At trial, respondent offered a different interpretation of the DNA report, but the trial court clearly rejected that interpretation. In fact, counsel's argument to the court concerning this interpretation is probably the reason why the trial court went through the trouble of explaining what a "sperm fraction" is and that sperm was necessary for successful DNA typing.

¶ 115                                    d. Relevant Case Law

¶ 116     We believe this case is similar to *People v. Thomas*, 364 Ill. App. 3d 91, 845 N.E.2d 842 (2006), in which, following an evidentiary hearing on the defendant's section 2-1401 petition (735 ILCS 5/2-1401 (West 2002)), the trial court assessed the credibility of the witnesses in light of the court's experience as a police officer. *Thomas*, 364 Ill. App. 3d at 96-97. Specifically, the parties presented conflicting testimony about whether police officers used the phrase "code blue" during the arrest of a person present during a shooting. *Id.* at 95-96. Officers testified they did not use such a phrase and to their knowledge no such phrase existed. *Id.* at 96. Defendant's witness testified the phrase was used. *Id.* at 95. The court stated it considered the argument and testimony " 'together with my experience in association with police work,' " and the court could not conceive of a motive for police officers to conceal information. *Id.* at 96. The court then stated as follows: " 'I am myself a former policer officer. I've never heard the phrase Code Blue. Never. I don't know if that's a product of [the witness's] vivid imagination or something more. But whatever the case, it raises a question of credibility.' " *Id.* at 97. The court continued to reference its police experience when discussing the testimony. *Id.* It concluded, " 'Based on the credibility of the witnesses, this petition is respectfully denied.' " *Id.*

¶ 117     On appeal, defendant argued the trial court improperly relied upon evidence outside the record when it considered its prior experience with the police in assessing credibility. *Id.* at 99. The First District, contrasting the case with *Wallenberg*, explained that testimony concerning the "credibility of the term 'code blue,' " was presented at the hearing, so the trial court was not considering evidence "conjured entirely from the judge's own personal experience." *Id.* at

100. The appellate court concluded that the trial court's "allusions" to past police work were "benign rhetorical comments on the evidence properly before the court. Consequently, these comments did not amount to an invalid basis for the court's judgment, which it specifically stated rested on the credibility of the witnesses." *Id.* The First District also noted that the trial court relied on other inconsistencies in the testimony to make a credibility determination and "any statements of personal knowledge *** did not serve as a basis for the court's determination." *Id.* at 100-01.

¶ 118   By contrast, in *Wallenberg*, the trial court indicated it knew the defendant was not telling the truth because, " 'He told me there were no gas stations on that stretch of the street where he could get air. I happen to know different. I don't believe his story.' " *Wallenberg*, 24 Ill. 2d at 354. The Illinois Supreme Court reversed because there was no support in the record for the trial court's statements, and therefore the presumption that the court relied upon only admissible evidence was rebutted. *Id.*

¶ 119   In this case, as in *Thomas*, the DNA evidence was properly before the trial court. Contrary to *Wallenberg*, the court did not rely on information that had no basis in the record. Instead, respondent had the opportunity to address the DNA evidence and the meaning of the report. Indeed, respondent argued that the report did not mean that sperm was found in the vaginal swab. Like *Thomas*, the court's comments here appear to be in response to respondent's arguments, and the court primarily and carefully considered other evidence that was properly before it to render its decision. The court's comments at issue did not serve as a basis for its determination.

¶ 120   Indeed, from a defendant's point of view, this case is not as strong as *Thomas* because, in that case, the court stated that when it was a police officer, it had never heard the phrase code blue and then stated the witness's testimony about such "raise[d] a question of credibility." Here, the trial court had already stated it did not believe I.P.-V. would have acted as she did if respondent's testimony were true. Accordingly, like the court in *Thomas*, we conclude that the trial court's improper "comments did not amount to an invalid basis for the court's judgment," and any information outside of the record "did not serve as a basis for the court's determination." *Thomas*, 364 Ill. App. 3d at 100-01.

¶ 121           C. Ineffective Assistance of Counsel: the Stipulation to DNA Evidence

¶ 122   Next, respondent argues his trial counsel was ineffective for stipulating to evidence that was harmful to respondent's case. Respondent contends trial counsel was under the mistaken belief that he could challenge the stipulated evidence at trial. Respondent points out that when parties stipulate to evidence, they generally give up their right to contest it because it removes the matter from contention entirely. Respondent also asserts that trial counsel's decision to stipulate ran counter to his trial strategy because the report showed that sperm was present in the vaginal swab, but respondent testified, and counsel argued, that no penetration occurred. Accordingly, respondent claims his counsel was ineffective for either (1) failing to understand the law, (2) stipulating to testimony that was against his client, or (3) stipulating to evidence that was contrary to the stated trial strategy. We disagree.

¶ 123                              1. *The Applicable Law*

¶ 124   "Minors in delinquency proceedings *** have a constitutional right to counsel." *People v. Austin M.*, 2012 IL 111194, ¶ 74, 975 N.E.2d 22. In particular, minors are entitled to "*effective*

- 19 -

*assistance* of counsel." (Emphasis in original.) *Id.* "Accordingly, ineffective-assistance-of-counsel claims in juvenile proceedings are reviewed under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." *In re Alonzo O.*, 2015 IL App (4th) 150308, ¶ 19, 40 N.E.3d 1228.

¶ 125　　To establish a claim of ineffective assistance of counsel, the respondent must show that "(1) *** counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability exists that, but for the error, the result would have been different." *In re N.A.*, 2018 IL App (1st) 181332, ¶ 40, 125 N.E.3d 990. Under the second prong, the question is whether counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair. *Id.*

¶ 126　　"To satisfy the deficiency prong of *Strickland*, a defendant 'must demonstrate counsel made errors so serious and counsel's performance was so deficient that counsel was not functioning as "counsel" guaranteed by the sixth amendment (U.S. Const., amend. VI).' " *Alonzo O.*, 2015 IL App (4th) 150308, ¶ 20 (quoting *In re Ch. W.*, 399 Ill. App. 3d 825, 829, 927 N.E.2d 872, 875 (2010)). This court is highly deferential of counsel's performance. *People v. McGath*, 2017 IL App (4th) 150608, ¶ 38, 83 N.E.3d 671. We use this deferential standard because "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.

¶ 127　　The defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *Alonzo O.*, 2015 IL App (4th) 150308, ¶ 20. "Matters of trial strategy generally will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing." *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 102, 26 N.E.3d 460. "Whether and how to conduct a cross-examination is generally a matter of trial strategy." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 83, 126 N.E.3d 703. The presumption of sound trial strategy may be overcome "by showing that counsel's approach to cross-examination was objectively unreasonable." *People v. Pecoraro*, 175 Ill. 2d 294, 327, 677 N.E.2d 875, 891 (1997).

¶ 128　　A defendant's failure to satisfy either prong negates a claim of ineffective assistance of counsel. *People v. Fellers*, 2016 IL App (4th) 140486, ¶ 23, 77 N.E.3d 994. A reviewing court defers to the trial court's factual findings but reviews *de novo* the ultimate issue of whether counsel rendered ineffective assistance. *People v. Westmoreland*, 2013 IL App (2d) 120082, ¶ 27, 997 N.E.2d 278.

¶ 129　　　　　　　　　　　　　　　2. *This Case*
¶ 130　　　　　　　　　　a. Counsel Did Not Foreclose His Argument
¶ 131　　As an initial matter, we disagree with respondent that counsel, by stipulating to the DNA report, could not make arguments relating to the contents of the report. "Since an evidentiary stipulation is, in effect, nothing more than an acknowledgement of what a witness would testify to if called, and a concomitant decision not to challenge the testimony the witness *would* give, a stipulation is not much different from a decision not to cross-examine." (Emphasis in original.) *People v. Phillips*, 217 Ill. 2d 270, 284, 840 N.E.2d 1194, 1202 (2005). In *Harris*, this court cited approvingly a decision of the Tenth Circuit, which stated, " 'Of course, a stipulation as to the testimony of a witness would give if called, although it may constitute evidence of the facts covered, is not an admission of the truth of such testimony and does not

- 20 -

prevent a party from attacking it as he might attack the testimony itself, had it been given.' " *People v. Harris*, 2015 IL App (4th) 140696, ¶ 36, 32 N.E.3d 211 (quoting *United States v. Spann*, 515 F.2d 579, 583 (10th Cir. 1975)).

¶ 132    In this case, the plain language of the evidence stipulation indicates that the parties were agreeing that the report should be introduced into evidence. However, the meaning of the statements in the report was still up for debate. Counsel argued about the meaning of those statements in a manner that was entirely consistent with respondent's defense.

¶ 133                      b. Counsel's Strategy Was Reasonable and
                              Respondent Was Not Prejudiced

¶ 134    Respondent does not explain how the DNA evidence could have been excluded had his counsel not stipulated to the report. Because this record demonstrates that the DNA evidence was going to be presented to the trial court, the only question was how the evidence would be presented. Trial counsel considered challenging the evidence with his own expert, but he decided against doing so because his expert told him that any "sloppiness" with the testing did not change the result.

¶ 135    Clearly, it would have been a bad strategy to call an expert whom the State could cross-examine to establish that any alleged problems with the DNA testing had in fact no impact on the ultimate result that supported the State's case. Additionally, any attempt to challenge the State's expert at trial ran the risk of allowing the State to shore up any weaknesses in its case, essentially tuckpointing the State's case by dispelling any doubts about the DNA evidence that counsel might hope to raise and, in fact, did raise in argument. See *Sturgeon*, 2019 IL App (4th) 170035, ¶¶ 95-96 (explaining counsel could reasonably decide not to pursue cross-examination of a witness to avoid giving the State the opportunity to present clarifying evidence); *People v. Towns*, 174 Ill. 2d 453, 467-68, 675 N.E.2d 614, 621 (1996) (substantially similar). By agreeing to the stipulation, counsel was able to challenge the inferences from that testimony in the same manner as he could challenge the inferences the State argued could be drawn from any other witness's testimony, and the stipulation denied the State the opportunity of asking any questions to fend off such attacks.

¶ 136    At the *Krankel* hearing, counsel indicated his strategy was to minimize the impact of the evidence entirely by stipulating to it. In his closing argument at trial, counsel stated that he agreed to the stipulation because the particular wording in the report gave him the ability to argue that the term "sperm fraction" did not mean sperm was present, which was in fact the argument counsel made. (See *supra* ¶ 44 for counsel's exact statement.) Because of the stipulation, counsel was able to ensure that the trial court heard the minimum amount of information about the DNA evidence, which could certainly be viewed as damaging evidence against respondent. Absent the stipulation, forcing the State to call its DNA expert to testify would have allowed the State to present far more information and might have highlighted the significance of that evidence.

¶ 137    We conclude that counsel's decision to stipulate to the testimony was trial strategy. Respondent not only cannot show that this strategy was "objectively unreasonable," but we view counsel's strategy as entirely sound.

¶ 138                    D. Statements Given During Polygraph Examination as Impeachment

¶ 139    Respondent next argues the trial court erred when it allowed the State to impeach him with statements made during a polygraph examination. Respondent contends that Illinois courts have held that polygraph evidence is inadmissible in all cases except when a defendant or witness makes a claim that a prior statement was the product of coercion, which is absent here. Respondent also notes that the rule against polygraph evidence applies without regard to whether the trier of fact is a judge or jury.

¶ 140    The State responds that Illinois law does not prohibit the use of statements made during a polygraph examination for the purposes of impeachment. The State points out that (1) the results of the polygraph examination were not introduced into evidence and (2) it was respondent who brought up the fact that Woody was a polygraph examiner when respondent answered a question that did not call for such information. We agree with the State.

¶ 141                                 1. *The Applicable Law*

¶ 142    Polygraph evidence is generally inadmissible in Illinois. *People v. Baynes*, 88 Ill. 2d 225, 240, 430 N.E.2d 1070, 1077 (1981). More specifically, Illinois has a firmly established rule against the introduction of the details of the results of polygraph examinations. *People v. Lewis*, 269 Ill. App. 3d 523, 527, 646 N.E.2d 305, 308 (1995). Polygraph evidence does not have sufficient reliability for admission, and if it is admitted, it is likely to be taken not merely as reliable, but as completely determinative of guilt or innocence. *People v. Gard*, 158 Ill. 2d 191, 201, 632 N.E.2d 1026, 1031 (1994). Moreover, the supreme court has stated that its "overriding concern *** is the preservation of the integrity of the judicial process." *People v. Jackson*, 202 Ill. 2d 361, 369, 781 N.E.2d 278, 282 (2002). Polygraph evidence runs the high risk of usurping the fact-finding role of the trial court or jury, and the supreme court has held that it can be plain error. *Gard*, 158 Ill. 2d at 205 (plain error requiring reversal when evidence of polygraph testing of witnesses was presented at trial); *Baynes*, 88 Ill. 2d at 230-31 (reversing despite the fact that the evidence was not closely balanced because stipulation to polygraph evidence by the parties impinged on the integrity of the judicial process).

¶ 143    The supreme court has noted there is no distinction between the undue weight of polygraph evidence whether the trial is held before a judge or a jury. See *Jackson*, 202 Ill. 2d at 369. Evidence concerning the circumstances of a polygraph is admissible only if it is used to rebut a claim by the defendant that his incriminating statement was improperly obtained. *People v. Jefferson*, 184 Ill. 2d 486, 497, 705 N.E.2d 56, 62 (1998).

¶ 144    However, prior inconsistent statements by a witness are generally admissible for impeachment purposes. *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 68, 993 N.E.2d 1. In addition, a trial court is presumed to consider only admissible evidence and to consider any evidence introduced for a limited purpose for that purpose only. *People v. Fletcher*, 328 Ill. App. 3d 1062, 1075, 768 N.E.2d 72, 82-83 (2002) (concluding the trial court did not err by admitting evidence that defendant took a polygraph because court stated it would not consider polygraph evidence in reaching a determination of guilt). In *Fletcher*, the trial court permitted the State to present evidence that a polygraph test had been administered after the defendant challenged the circumstances surrounding his statements. *Id.* at 1074. The court stated it was considering the evidence for a limited purpose and that it did not know the results. *Id.* The appellate court affirmed, noting that "the trial judge assured all concerned that he would not consider polygraph evidence in reaching a judgment," and the record supported that

conclusion. *Id.* at 1075.

¶ 145                                   2. *This Case*
¶ 146                     a. Statements Made During Polygraph Examination
                                   May Be Admissible for Impeachment

¶ 147      Although the issue of whether statements given during a polygraph examination may be admissible for other purposes has not been addressed in Illinois, courts of other states have held that such statements may be admitted when used to impeach or corroborate the testimony of a witness at trial. *E.g.*, *State v. Green*, 781 P.2d 678, 685 (Kan. 1989); *Commonwealth v. Moynihan*, 381 N.E.2d 575, 581 (Mass. 1978); *People v. Powell*, 256 N.W.2d 583, 585 (Mich. Ct. App. 1977). The United States Supreme Court has also noted that although the results of polygraph examinations are not admissible, the statements a defendant makes in response to questioning during the course of that examination are admissible. *Wyrick v. Fields*, 459 U.S. 42, 48 n.* (1982) (*per curiam*).

¶ 148      Similar to the courts in our sister states, we conclude that prior inconsistent statements made during a polygraph examination are admissible to the same extent as any other prior inconsistent statement, provided that all references to the polygraph examination are removed. See *Wright v. State*, 154 S.W.3d 235, 239 (Tex. App. 2005). If the trier of fact is never informed about the existence of a polygraph examination, the concerns and justifications for barring such evidence are removed. Compare *id.* with *People v. Taylor*, 101 Ill. 2d 377, 392-93, 462 N.E.2d 478, 485 (1984) ("The nature of the [polygraph] information is such that the only way to be sure that a juror is not influenced by it is to insure that the juror is never exposed to the information in the first place."). Assuming the trier of fact is never informed about the existence of a polygraph examination, the prior inconsistent statements that were made during that examination are indistinguishable from any other similar evidence.

¶ 149      We note that given the extremely prejudicial nature of polygraph evidence, and the fact that the State should know in every case before trial whether it might wish to use statements made during a polygraph should an accused testify, a sound practice would be for the State to provide notice to fairly apprise both the accused and the trial court of the possibility that it may seek to introduce such statements. See *People v. Rosemond*, 339 Ill. App. 3d 51, 61, 790 N.E.2d 416, 425 (2003) ("[B]efore a trial court allows the State to introduce polygraph evidence at trial ***, the trial court should apply enhanced scrutiny to ensure that any references to a polygraph are necessary and of minimal prejudicial impact and that no other appropriate alternative impeachment evidence is available to the State. In addition, the trial court must formulate a clear cautionary instruction for the jury."). Additionally, the State should caution any of its witnesses to refrain from mentioning (1) the word "polygraph" or "lie detector" (or any similar phrase) or (2) the results of any such examination. See *Lewis*, 269 Ill. App. 3d at 527 ("[T]he prosecutor retains the duty to admonish the State's witnesses *never* to mention polygraph examinations during their testimony." (Emphasis in original.)).

¶ 150      The State's questioning of Woody in this very case demonstrates the hazards of inquiring about statements made during a polygraph examination. The State asked if Woody "worked locally," and Woody responded, "I do. I'm a polygraph examiner." Even though this information was both volunteered and improper, it had no impact here because the trial court was already aware of Woody's profession and the purpose for his testimony. But had this same exchange occurred in a jury trial, it likely would have been enough by itself to require reversal

- 23 -

of any conviction. This exchange demonstrates the risk the State takes when using such evidence and why it is so important for the State (1) to carefully craft its questions to prevent eliciting such testimony and (2) to apprise its witnesses in advance to refrain from mentioning *anything* pertaining to a polygraph examination.

¶ 151                    b. The Trial Court Did Not Consider the Polygraph Evidence

¶ 152    The trial court in this case made sure the results of the polygraph examination were not introduced, and the record contains no indication that the court was even made aware of them. Although the Illinois Supreme Court in *Jackson* has stated that the damage to the integrity and reputation of the judicial process due to the admissibility of inherently unreliable polygraph evidence is the same whether the case is tried before a jury or a judge (*Jackson*, 202 Ill. 2d at 369), that statement applies when, as in *Jackson*, the record shows that the judge in a bench trial may have considered the polygraph evidence substantively. We note that the State in *Jackson* argued that the polygraph evidence in question was properly considered "for a limited purpose," but the supreme court rejected this contention, writing, "[T]he trial court did not clearly define this 'limited purpose.' From our review of the record, we conclude that the judge intended to consider the evidence as part of the 'course of conduct' ***." *Id.* at 370.

¶ 153    This case is clearly distinguishable from *Jackson* because, here, the trial court did not consider the polygraph examination *at all* when making its ruling. For that reason, it cannot be said that the polygraph affected the integrity of the judicial process.

¶ 154    As in *Fletcher*, the trial court repeatedly indicated it was not considering (1) the fact that the statement was made during a polygraph examination, (2) that Woody was a polygraph examiner, or (3) the results of any examination. Likewise, the trial court's findings in this case support the conclusion that the court did not consider the polygraph statements at all. Notably, although the court discussed the testimony in great detail when making its ruling, the court did not mention Woody or the impeachment testimony. Instead, the court found I.P.-V. and X.P.'s version of events more convincing and found the DNA evidence supported its conclusion that sexual intercourse occurred, contrary to respondent's testimony. Accordingly, we conclude the record demonstrates the trial court did not give any weight to the fact that respondent took a polygraph examination.

¶ 155    Last, we note that respondent volunteered information about the polygraph unprompted by the State. See *People v. Stacey*, 25 Ill. 2d 258, 265-66, 184 N.E.2d 866, 870 (1962) (no error where defendant volunteered making statement during "lie detector test" in response to a proper question about a prior inconsistent statement), *overruled on other grounds by People v. Nunn*, 55 Ill. 2d 344, 304 N.E.2d 81 (1973). When respondent denied having ever given a statement in the case, the State asked if he knew a man named "Steve Woody." Respondent answered, "The polygraphic [*sic*] guy." Although the response is not unforeseeable, the State certainly did not elicit it. A defendant should not be able to inject a potential error into the trial, only to later claim the trial was unfair because of the error he injected. See *People v. Cortes*, 181 Ill. 2d 249, 283, 692 N.E.2d 1129, 1144 (1998).

¶ 156                            E. The One-Act, One-Crime Doctrine

¶ 157    Last, respondent argues that he was convicted of all three offenses based on a single act of penetration. Therefore, respondent asserts that his convictions should have merged into the

most serious offense. The State does not contest respondent's one-act, one-crime argument, and we agree with respondent.

¶ 158 In Illinois, the "one-act, one-crime rule prohibits convictions for multiple offenses that are based on precisely the same physical act." *People v. Smith*, 2019 IL 123901, ¶ 13. An "act" is defined as "any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45 (1977). When a defendant is convicted in violation of the one-act, one-crime rule, the appellate court should vacate the conviction for the less serious crime. *In re Samantha V.*, 234 Ill. 2d 359, 379, 917 N.E.2d 487, 500 (2009). The offense that carries the greater punishment is considered the more serious offense. *Id.*

¶ 159 Respondent was adjudicated delinquent because he committed criminal sexual assault and two counts of criminal sexual abuse. The trial court specifically based its ruling on the act of penetration, not on the act of respondent touching I.P.-V.'s vagina. This finding makes sense because one of the counts of criminal sexual abuse alleged touching through the use of force and respondent's testimony that he touched I.P.-V.'s vagina indicated it was consensual. I.P.-V. testified that respondent touched her vagina only when he put his penis in her and denied respondent touched her vagina in any other way. Additionally, the State only presented evidence that respondent forcefully touched I.P.-V.'s vagina by penetration. Accordingly, because all three convictions were based on precisely the same physical act, respondent's offenses for criminal sexual abuse must merge into the more serious offense of criminal sexual assault.

¶ 160                                                    III. CONCLUSION

¶ 161 For the reasons stated, we vacate respondent's adjudications of delinquency for criminal sexual abuse. We affirm the trial court's judgment in all other respects.

¶ 162 Affirmed in part and vacated in part.